# United States Court of Appeals
## For the First Circuit

No. 05-1376

IVÁN TOLEDO,

Plaintiff - Appellee,

UNITED STATES,

Intervenor,

v.

JORGE L. SÁNCHEZ, Deputy President; GEORGE V.
HILLYER, Chancellor; JOHN HERTZ, Dean; PEDRO PADILLA,
Counselor; SONIA BAZÁN, Design Professor; NATHANIEL
FUSTER, Design Professor/Design Committee Director;
UNIVERSITY OF PUERTO RICO,

Defendants - Appellants.

UNIVERSITY OF PUERTO RICO, Río Piedras Campus;
UNIVERSITY OF PUERTO RICO, Río Piedras Campus-Resource
Office for the Disabled; LUDIM DÍAZ; UNIVERSITY OF
PUERTO RICO, Río Piedras Campus, Legal Advisor's
Office; LUIS M. VÁZQUEZ, Director; MARÍA LUGO,
Legal Advisor; UNIVERSITY OF PUERTO RICO, Río Piedras
Campus - School of Architecture; MANUEL GARCÍA;
LIZETTE COLÓN, Student Affairs Administrator,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador Casellas, <u>U.S. District Judge</u>]

Before

Torruella, <u>Circuit Judge</u>,
John R. Gibson, <u>Senior Circuit Judge</u>[*]
and Howard, <u>Circuit Judge</u>.

———————————————

<u>Julio Nigaglioni Arrache</u>, for Appellants.
<u>Víctor P. Miranda-Corrada</u>, for Appellee.
<u>Sarah E. Harrington</u>, Department of Justice, Civil Rights Division, with whom <u>Bradley J. Schlozman</u> and <u>Jessica Dunsay Silver</u> were on brief, for the United States as Intervenor.
<u>Jennifer Mathis</u>, Bazelon Center for Mental Health Law, with whom <u>Debra Gardner</u>, <u>Roscoe Jones, Jr.</u>, and <u>Suzanne Sangree</u>, Public Justice Center, were on brief, for AARP, Bazelon Center, Public Justice Center, and 23 other organizations representing people with disabilities, as Amici Curiae in support of appellee.

———————————————

July 6, 2006

———————————————

---

[*]Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

**JOHN R. GIBSON, <u>Circuit Judge</u>.** This appeal raises the question of whether the Eleventh Amendment prevents a disabled student from suing a state university for damages under Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12131-12165. Iván Toledo, a student at the University of Puerto Rico who has schizoaffective disorder, brought an action under Title II of the ADA alleging that the University and various University officials discriminated against him on the basis of his disability and failed to reasonably accommodate his disability. The University moved to dismiss the Title II claims under Fed. R. Civ. P. 12(b)(6) and the Eleventh Amendment. The district court granted the motion on Eleventh Amendment immunity grounds, but later reinstated the claims in the wake of the Supreme Court's decision in <u>Tennessee</u> v. <u>Lane</u>, 541 U.S. 509 (2004). The University filed an interlocutory appeal to this court. We have jurisdiction under <u>Puerto Rico Aqueduct and Sewer Auth.</u> v. <u>Metcalf & Eddy, Inc.</u>, 506 U.S. 139 (1993), and we affirm.

## I.

Because this case is at the motion to dismiss stage, we accept as true the facts alleged in the complaint and draw all reasonable inferences in Toledo's favor. <u>Educadores Puertorriqueños en Acción</u> v. <u>Hernández</u>, 367 F.3d 61, 62 (1st Cir. 2004); <u>Neo Gen Screening, Inc.</u> v. <u>New England Newborn Screening Program</u>, 187 F.3d 24, 25 (1st Cir. 1999). Toledo began his studies

at the University of Puerto Rico School of Architecture in the fall of 1999, but during the first semester his mental condition deteriorated, causing him to experience anxiety, panic, and depression.  Because of his condition and the required treatment, he was unable to attend classes regularly for part of the semester. When Toledo returned to a regular schedule, one of his professors refused to accommodate his situation; because of the professor's refusal to make any accommodation, Toledo turned in an incomplete assignment which the professor ridiculed in front of the class. Toledo continued to request accommodation from the professor and school administrators.  However, these requests were denied and he completed the semester with a grade of D in the course.

During the summer after his first year, Toledo suffered an emotional crisis, attempted suicide, and was hospitalized for some time.  He was absent from school during the fall semester of his second year for another hospital stay.  When he returned to classes, the school still refused to provide accommodation. Toledo often arrived up to 45 minutes late to class because of side effects from his medication, and despite presenting medical certificates and explaining his situation, his design professor treated him differently from other students who arrived late.  The professor also refused to grant him any additional time to complete his work, causing Toledo to receive a failing grade in the class. Later, the dean reprimanded him for complaining about this

-4-

professor on an evaluation form.  Toledo had difficulty registering for classes the following semester due to his poor academic standing.  When the University refused to allow him to take courses at another university to preserve his standing, Toledo dropped out of school entirely.

After filing an administrative complaint with the United States Department of Justice, Toledo filed a pro se complaint in the United States District Court of Puerto Rico asserting claims under 42 U.S.C. § 1983; the Rehabilitation Act of 1973, 29 U.S.C. § 794; the ADA, 42 U.S.C. § 12101 et seq.; and the Constitution of the United States, among other claims.  The University and University officials, who were sued in their official capacity, moved to dismiss the Title II claims under Fed. R. Civ. P. 12(b)(6) and on Eleventh Amendment immunity grounds.  The district court initially granted this motion, but reinstated the claims upon Toledo's motion after the Supreme Court's decision in Tennessee v. Lane, 541 U.S. 509 (2004).  The University filed a motion for reconsideration under Rule 59(e), which was denied, and then filed this interlocutory appeal.

II.

Congress enacted Title II of the ADA to combat discrimination by governmental entities in the operation of public services, programs, and activities.  It provides that "no qualified individual with a disability shall, by reason of such disability,

be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The statute authorizes private suits against public entities to enforce its provisions. See 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a).

The Eleventh Amendment guarantees that private individuals may not sue nonconsenting states[1] in federal court. Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). Nevertheless, Congress can abrogate this immunity so long as it makes "its intention to abrogate unmistakably clear in the language of the statute" and acts "pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 726 (2003). With respect to Title II, Congress has met the first requirement of unequivocally expressing its intent to abrogate state sovereign immunity. See Tennessee v. Lane, 541 U.S. 509, 518 (2004) (citing 42 U.S.C. § 12202). As to the second requirement, the Supreme Court has held that Title II of the ADA validly abrogates sovereign immunity as to

---

[1]We have held on numerous occasions that Puerto Rico is a state for Eleventh Amendment immunity purposes. See, e.g., De Leon Lopez v. Corporacion Insular de Seguros, 931 F.2d 116, 121 (1st Cir. 1991); Ramírez v. Puerto Rico Fire Serv., 715 F.2d 694, 697 (1st Cir. 1983) ("Puerto Rico, despite the lack of formal statehood, enjoys the shelter of the Eleventh Amendment in all respects."). The University of Puerto Rico is considered an arm of the state within the purview of the Eleventh Amendment. Pinto v. Univ. of P.R., 895 F.2d 18, 18 (1st Cir. 1990).

-6-

(1) state conduct that actually violates the Constitution, United States v. Georgia, 126 S. Ct. 877, 882 (2006), and (2) some classes of state conduct that do not facially violate the Constitution but are prohibited by Title II in order to "prevent and deter unconstitutional conduct." Lane, 541 U.S. at 518, 529. Thus, in order to decide whether Toledo can sue the University for damages we must determine "on a claim-by-claim basis, (1) which aspects of the state's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." Georgia, 126 S. Ct. at 882.

### III.

Pursuant to the Supreme Court's direction in United States v. Georgia, we first must ascertain if any aspect of the University's alleged conduct states a claim for a violation of Title II.[2] To state a claim for a violation of Title II, a plaintiff must allege: (1) that he is a qualified individual with

---

[2]The United States, intervenor in this case, submitted a supplemental letter brief after the Supreme Court's decision in Georgia urging us to remand the case to the district court for the determination of whether Toledo validly alleged violations of Title II and whether those claims would independently state constitutional violations. However, as this analysis simply requires a legal determination under the standard set out in Fed. R. Civ. P. 12(b)(6), and because a remand would further prolong the lengthy course of this litigation, we will address these questions.

a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits or discrimination was by reason of his disability. Parker v. Universidad de Puerto Rico, 225 F.3d 1, 4 (1st Cir. 2000); 42 U.S.C. § 12132. Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden. Parker, 225 F.3d at 5 (citing 28 C.F.R. § 35.150).

Toledo's Third Amended Complaint alleges that the University violated Title II of the ADA both by discriminating against him based on his disability and by failing to provide him with reasonable accommodation.[3] Toledo properly alleges that he is a qualified individual with a disability as he alleges that he has a mental impairment, schizoaffective disorder, that substantially limits the major life activity of learning, and that save for his disability he was qualified to participate in the architecture

_____

[3]Toledo's Third Amended Complaint also claims that the University retaliated against him for demanding his rights under the ADA, which would violate Title V of the ADA, 42 U.S.C. § 12203. The district court did not evaluate this claim in the motion to dismiss below and this interlocutory appeal only concerns the reinstatement of Toledo's Title II claims. Accordingly, we do not address whether Title V of the ADA validly abrogates state sovereign immunity.

program at the University.  See 42 U.S.C. § 12131; 28 C.F.R. § 35.104.  He also sufficiently alleges that the University, a public entity governed by the ADA, engaged in conduct that violated Title II.  Toledo claims that he failed his design course as a result of "discriminatory animus" on the part of his professor and the dean, and that his design professor ignored him when he arrived late to class unlike other tardy students without disabilities.  Toledo also avers that he was unable to fulfill the requirements of his courses because of his disability and that his professors, his advisor, and the dean all refused to provide reasonable accommodation so that he could complete his course work and register for classes.  For example, he states that his design professor suggested that he abandon his prescription medication because it was preventing him from arriving on time to class and advised him that she would not grant him exceptions or any additional time to complete his work.

The University may ultimately be able to negate the charges of discrimination or show that the two instances of "discrimination" in fact were simply the application of neutral criteria that applied to disabled and nondisabled students alike.  See, e.g., Baird ex rel. Baird v. Rose, 192 F.3d 462, 467-68 (4th Cir. 1999).  The University may also be able to show that it considered Toledo's accommodation requests but determined as a matter of professional, academic judgment that such requests were

not reasonable because they would lower academic standards or substantially alter the degree program.  See Darian v. Univ. of Mass. Boston, 980 F. Supp. 77, 88-89 (D. Mass. 1997).  However, at this stage in the litigation, Toledo's complaint sufficiently alleges state conduct that violated Title II of the ADA.

IV.

The next step under United States v. Georgia is to evaluate whether any of the University's conduct that violated Title II independently states a violation of the Fourteenth Amendment.  126 S. Ct. at 882.  There are two potential sources of constitutional rights in the context of discrimination or a failure to accommodate a disability in public education:  the Due Process and the Equal Protection Clauses of the Fourteenth Amendment.

The Due Process Clause guarantees some notice and an opportunity to be heard before a student can be suspended or expelled from school.  Goss v. Lopez, 419 U.S. 565, 574 (1975). These rights are implicated when a student's future attendance at a public institution of higher education is in jeopardy. See Gorman v. Univ. of R.I., 837 F.2d 7 (1st Cir. 1988).  However, because Toledo voluntarily left the architecture program at the University, his Title II claims raise no due process concerns.

The Equal Protection Clause requires states to treat alike all persons similarly situated.  Plyler v. Doe, 457 U.S. 202, 216 (1982).  To assess whether the University's conduct violated

-10-

this guarantee, we must determine the appropriate level of scrutiny to be applied to Toledo's claims. Unless state action burdens a suspect class or impinges upon a fundamental right, we review equal protection claims for a rational relationship between the disparity of treatment and a legitimate government purpose. Heller v. Doe, 509 U.S. 312, 319 (1993).

The disabled are not a suspect class for equal protection purposes. City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 439, 448-50 (1985). In addition, public education is not a fundamental right. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973). However, neither is education "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." Plyler, 457 U.S. at 221. The Supreme Court has "repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to 'sustaining our political and cultural heritage' with a fundamental role in maintaining the fabric of society." Grutter v. Bollinger, 539 U.S. 306, 331 (2003) (quoting Plyler, 457 U.S. at 221); see also Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954); Bolling v. Sharpe, 347 U.S. 497, 499-500 (1954). Therefore, the Supreme Court struck down under heightened scrutiny the exclusion of a discrete group of children from a free public education offered to other resident children as violative of equal protection. Plyler, 457 U.S. at 230.

-11-

Nonetheless, aside from outright exclusion, the Supreme Court continues to employ rational basis review for classifications that burden the educational opportunities of a non-suspect class. See Kadrmas v. Dickinson Public Sch., 487 U.S. 450, 459 (1988). Therefore, states may treat disabled students differently or refuse to make special accommodations for the disabled so long as the states' actions are rationally related to some legitimate governmental purpose. Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 366-68 (2001). States may not, however, treat disabled students differently solely out of "irrational prejudice." Cleburne, 473 U.S. at 450.

With respect to Toledo's claims that the University failed to accommodate his disability, he must allege that these decisions were irrational and not motivated by any conceivable legitimate reason. See Garrett, 531 U.S. at 367-68; Heller, 509 U.S. at 320. Even reading Toledo's complaint generously, he has failed to allege that the University's failure to accommodate his situation was due to irrational prejudice and, indeed, rational bases for the actions are apparent from the face of the complaint. Toledo alleges that the University failed to accommodate his disability in the following ways: his design professor refused to allow him to regularly arrive late to class and made class participation a substantial part of the grading scheme, two professors would not extend deadlines for written work, and the

University declined to open an afternoon section of a required course when Toledo informed the Dean that he was unable to attend morning sessions due to his medication. All of these actions are rationally related to the University's academic mission and budgetary constraints and thus do not rise to the level of constitutional violations. See Heller, 509 U.S. at 320.

Toledo also contends that the University actively discriminated against him on the basis of his disability, rather than merely failing to make accommodation. Toledo claims that the Dean and his professor gave him a failing grade in his design class because of their "discriminatory animus" and that his design professor treated him differently from other students who arrived late to class. Although there is no heightened pleading standard for civil rights claims, mere conclusory allegations of discrimination unsupported by any facts are insufficient for notice pleading purposes. See Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 68 (1st Cir. 2004). In order to state a claim for discrimination that violates equal protection, Toledo must allege that he was intentionally treated differently from others similarly situated and there was no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam). However, Toledo admits in his complaint that he was repeatedly 45 minutes late to his design class, absent for several weeks due to a hospital stay, and that

-13-

many of his assignments were late or incomplete.  He does not allege that any other students who had similar records received better than a failing grade.  Nor does he allege that any other late-arriving students had the same record of repeated tardiness. See  Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56-57 (1st Cir. 2006).  Toledo has therefore failed to allege state conduct that independently states a claim for a violation of the Equal Protection Clause.

V.

Because Toledo has stated a claim that the University violated Title II but not the Fourteenth Amendment, we must address whether Congress's abrogation of sovereign immunity as to that class of conduct is valid as a prophylactic measure within Congress's § 5 power.  United States v. Georgia, 126 S. Ct. 877, 882 (2006).  "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'"  City of Boerne v. P.F. Flores, 521 U.S. 507, 518 (1997) (quoting Fitzpatrick v. Bitzer, 427 U.S. 445, 455 (1976)); see also Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721 (2003) (upholding Family and Medical Leave Act as valid prophylactic legislation designed to combat

-14-

unconstitutional sex discrimination although the state's leave policy itself was constitutional).

To determine whether prophylactic legislation under § 5 is valid, a court must consider: (1) the constitutional right or rights that Congress sought to protect when it enacted the statute; (2) whether there was a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and (3) whether the statute is a congruent and proportional response to the history and pattern of constitutional violations. See Tennessee v. Lane, 541 U.S. 509, 522-31 (2004) (describing the elements of the test first established by the Supreme Court in City of Boerne, 521 U.S. at 529-36).

In applying the first two steps of the City of Boerne test, the Court in Lane discussed the range of constitutional guarantees implicated by Title II and the history of constitutional violations in all areas of public services, including health care, zoning, marriage, jury service, the penal system, public education, and voting. Id. at 522-26. The Court concluded that the "sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services," made it "clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." Id. at 528-29. Then, at the third

step of the analysis, the Court chose to focus on the congruence and proportionality of Title II as applied only to judicial services, declining to consider Title II as an "undifferentiated whole." Id. at 530.

Some appellate courts have chosen to interpret this approach in Lane as conclusively establishing that Title II survives the first two steps of the City of Boerne inquiry, leaving only the congruence and proportionality of Title II at issue for future cases that concern other areas of government conduct. See, e.g., Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 487 (4th Cir. 2005); Cochran v. Pinchak, 401 F.3d 184, 191 (3d Cir.), vacated pending decision in United States v. Georgia, 412 F.3d 500 (3d Cir. 2005); Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ., 405 F.3d 954, 958 (11th Cir. 2005). Indeed, we stated in Badillo-Santiago, M.D. v. Naveira-Merly, 378 F.3d 1, 5-6 (1st Cir. 2004), that the Lane opinion establishes that Title II as a whole satisfies the first two steps of City of Boerne. However, that case was brought by a litigant who claimed that a state court had failed to accommodate his hearing impairment, and so our decision involved a direct application of the access to the courts holding of Lane. Therefore, our statement was only dictum for purposes of Title II's application to other areas of government conduct.

We believe the sounder approach is to focus the entire City of Boerne test on the particular category of state conduct at issue. As recognized by the Court in Lane, Title II "reaches a wide array of official conduct in an effort to enforce an equally wide array of constitutional guarantees," applying "not only to public education and voting booth access but also to seating at state-owned hockey rinks." 541 U.S. at 530. The history of discrimination and the need for prophylaxis will vary greatly in these different contexts. It is necessary to understand the specific constitutional rights and the history of constitutional violations in the particular area at issue in order to determine the congruence and proportionality of Title II's measures in that area. While the Lane opinion does speak broadly about Title II in its discussion of the first two steps of the City of Boerne inquiry, the opinion separately addresses the particular rights at stake and the record of constitutional violations in the context of judicial services and later draws on that discussion in buttressing its argument that Title II is congruent and proportional legislation as applied to judicial services. See Lane, 541 U.S. at 523, 527, 531-32.

In order to apply the City of Boerne test to the class of conduct at issue here, we must ascertain the level of generality at which to conduct our inquiry. The University contends that we should limit our decision to the validity of Title II as it applies

to the conduct of public universities, while the United States contends that we should consider government conduct at all levels of public education.  In Lane, the Court decided the validity of Title II as it applied to the class of cases implicating the "accessibility of judicial services," including applications to criminal defendants, civil litigants, jurors, public spectators, the press, and witnesses. 514 U.S. at 531, 522-23.  A number of these statutory applications and the corresponding constitutional rights that they implicated were neither presented by the plaintiffs in Lane nor directly related to the facts of the case. The Supreme Court's broad treatment of judicial services suggests that we should consider Title II as it applies to public education in general.  The Lane opinion covered an even more varied range of government conduct than the United States urges in this case, so we conclude that our analysis should be applied to public education generally.

A.

The first step of the City of Boerne analysis is identifying the constitutional rights that Congress sought to protect by enacting Title II and applying it to public educational institutions.  Lane, 541 U.S. at 522.  The Supreme Court's Equal Protection Clause and Due Process Clause jurisprudence places a special emphasis on the constitutional rights implicated by discrimination in public education, and Title II seeks to enforce

-18-

those rights by prohibiting discrimination against the disabled and providing for accommodations of their special needs.

The Supreme Court has recognized the vital importance of all levels of public education in preparing students for work and citizenship as well as the unique harm that occurs when some students are denied that opportunity. See, e.g., Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954) ("[I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education"); Grutter v. Bollinger, 539 U.S. 306, 331 (2003) ("[T]he diffusion of knowledge and opportunity through public institutions of higher education must be accessible to all individuals"). The Court's decisions under the Equal Protection Clause suggest that states cannot categorically deny disabled students access to public education. See Plyler v. Doe, 457 U.S. 202, 221-22 (1982) (striking down on equal protection grounds the complete exclusion of the children of illegal aliens from public schools and noting that "the benefits of education are not reserved to those whose productive utilization of them is a certainty"); Bd. of Educ. v. Rowley, 458 U.S. 176, 200 (1982) (describing the Education for All Handicapped Children Act, which requires states to assure disabled students access to public education, as providing "a 'basic floor of opportunity' consistent with equal protection"). In addition, the Due Process Clause protects against the arbitrary exclusion of disabled students from public

-19-

educational institutions, in light of the property and liberty interest in receiving a public education. See Bolling v. Sharpe, 347 U.S. 497, 499-500 (1954); Goss v. Lopez, 419 U.S. 565, 574 (1975); Gorman v. Univ. of R.I., 837 F.2d 7, 12 (1st Cir. 1988) (student's interest in pursuing a higher education is included within the Fourteenth Amendment's protection of liberty and property). Finally, with respect to the disabled students already attending public schools and universities, the Equal Protection Clause prohibits "irrational disability discrimination," therefore forbidding states from relying on irrational fears and prejudice to discriminate against disabled students or to deny them reasonable accommodation. Lane, 541 U.S. at 522; Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001).

## B.

Having identified the constitutional rights implicated by the states' treatment of the disabled in the area of public education, we next consider whether there is a history of a violation of those rights by the states. Lane, 541 U.S. at 523. Moreover, we evaluate how grave and how widespread the constitutional violations were in order to judge the appropriateness of prophylactic legislation. See Hibbs, 538 U.S. at 729. We rely on the types of sources that the Supreme Court

approved of in <u>Lane</u>:  state statutes, court decisions, and examples from the legislative history of the ADA.[4]

Historically, children with mental disabilities were labeled "ineducable" and were categorically excluded from public schools to "protect nonretarded children from them." <u>Cleburne</u>, 473 U.S. at 463 (Marshall, J., concurring).  Congress first addressed the education of the disabled in 1966, when it amended the Elementary and Secondary Education Act of 1965 to provide grants for states to initiate and improve programs for the education of handicapped children.  Pub. L. 89-750 § 161.  Yet by statute, a number of states continued to exclude children with disabilities from public education entirely.  <u>See, e.g.,</u> Ala. Code § 21-1-10 (1975); Del. Const. art. X, § 1 (1975); Neb. Rev. Stat. § 79-202 (1971); N.C. Gen. Stat. § 115-165 (1966); Nev. Rev. Stat. § 392.050 (1967); Tex. Code Ann. § 3260 (1990).

Numerous lower court decisions demonstrate that the states were violating the Due Process and Equal Protection rights of disabled children by completely denying them educational opportunities.  <u>See, e.g.,</u> <u>Pa. Ass'n for Retarded Children</u> v. <u>Commonwealth</u>, 343 F. Supp. 279, 293, 297 (E.D. Pa. 1972) (finding

---

[4]The Court recognized that many of the examples of constitutional violations concerned the conduct of non-state governments. Nevertheless, the Court stated that "our cases have recognized that evidence of constitutional violations on the part of nonstate governmental actors is relevant to the § 5 inquiry." 541 U.S. at 527 n. 16.

-21-

the state's treatment of mentally retarded children "crass and summary" and expressing "serious doubts" about any rational basis for the state's exclusion of approximately 75,000 mentally retarded children from any public education services); Mills v. Bd. of Ed. of D.C., 348 F. Supp. 866, 876 (D.D.C. 1972) (holding that District of Columbia violated due process by denying handicapped students a publicly supported education and suspending or expelling such children from regular schooling or special instruction without a hearing); Harrison v. Michigan, 350 F. Supp. 846, 847 (E.D. Mich. 1972) (noting that the state's denial of an education to handicapped children until 1971 raised serious equal protection issues); Fialkowski v. Shapp, 405 F. Supp. 946, 958 (E.D. Pa. 1975) (mentally retarded children who were completely denied an educational opportunity had stated a valid equal protection claim).

Congressional studies in the early 1970s revealed that of the roughly eight million handicapped children in the United States, one million were "excluded entirely from the public school system" and more than half were not receiving appropriate educational services. See Bd. of Educ. v. Rowley, 458 U.S. 176, 189 (1982) (citing 89 Stat. 774, note following § 1401). Congress found that the disabled children who were not excluded from public education were "simply 'warehoused' in special classes or were neglectfully shepherded through the system until they were old

enough to drop out."  Honig v. Doe, 484 U.S. 305, 309-11 (1988) (citing H.R. Rep. No. 94-332, p.2 (1975)).

In response, in 1973 Congress enacted the Rehabilitation Act, 29 U.S.C. § 794, which forbids any program receiving federal aid from discriminating against an individual by reason of a handicap.  And in 1975 Congress went even further by enacting the Education for All Handicapped Children Act, later renamed the Individuals with Disabilities Education Act, which requires states receiving federal funding for education to assure all handicapped children the right to a "free appropriate public education."  20 U.S.C. § 1412(1).  The Supreme Court characterized this latter legislation as intending to "aid the States in complying with their constitutional obligations to provide public education for handicapped children."  Smith v. Robinson, 468 U.S. 992, 1009 (1984).

Even after this early federal legislation, states continued to violate the constitutional rights of disabled students.  See, e.g., Hairston v. Drosick, 423 F. Supp. 180, 184 (S.D.W.Va. 1976) (public school violated Due Process Clause by excluding a student with spina bifida from regular public classroom without procedural safeguards); Cuyahoga County Ass'n for Retarded Children & Adults v. Essex, 411 F. Supp. 46, 58-59 (N.D. Ohio 1976) (finding Ohio regulations governing the placement and dismissal of mentally retarded children violated due process); Panitch v.

-23-

Wisconsin, 444 F. Supp. 320, 322 (E.D. Wis. 1977) (holding that Wisconsin violated equal protection rights of handicapped children by denying them an education at public expense); N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 466 F. Supp. 487, 504 (E.D.N.Y. 1979) (segregation of mentally retarded students with hepatitis B found to be without rational basis). In addition, a number of cases brought under the Rehabilitation Act and the Education of All Handicapped Children Act discuss the persistent negative attitudes and irrational public fears that led to the exclusion of students with AIDS (who qualify as "handicapped") from public schools, despite the lack of evidence of AIDS transmission in school settings. See, e.g., Thomas v. Atascadero Unified Sch. Dist., 662 F.Supp. 376 (C.D.Cal. 1986); Robertson v. Granite City Cmty. Unit Sch. Dist. No. 9, 684 F.Supp. 1002 (S.D. Ill. 1988); Doe v. Dolton Elem. Sch. Dist. No. 148, 694 F. Supp. 400 (N.D. Ill. 1988).

A report before Congress in 1983 indicated that tens of thousands of disabled children continued to be excluded from public schools or placed in inappropriate programs. U.S. Civil Rights Commission, Accommodating the Spectrum of Individual Abilities 28-29 (1983). Testimony before the House Committee on Education and Labor and the Senate Subcommittee on Disability Policy included statements by numerous disabled individuals who had been excluded from participation or faced irrational prejudice at all levels of

-24-

public education.  See generally, Staff of House Comm. on Education and Labor, 101st Cong., Legislative History of Pub. L. No. 101-336: The Americans with Disabilities Act (Comm. Print 1990).

In sum, the thirty years preceding the enactment of the ADA evidence a widespread pattern of states unconstitutionally excluding disabled children from public education and irrationally discriminating against disabled students within schools.  Faced with this record of persistent unconstitutional state action, coupled with the inability of earlier federal legislation to solve this "difficult and intractable problem," Congress was justified in enacting prophylactic § 5 legislation in response.  See Hibbs, 538 U.S. at 735, 737.

C.

The remaining question is whether the provisions of Title II, as applied to public educational institutions, are a congruent and proportional response to this history and pattern of unconstitutional discrimination.  Lane, 541 U.S. at 530.  We must determine whether the application of Title II to public educational institutions is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior."  City of Boerne, 521 U.S. at 532.

Title II provides that otherwise qualified disabled students may not be excluded from educational programs or

activities or otherwise discriminated against because of their disabilities. 42 U.S.C. § 12132. Schools and universities must make "reasonable modifications to rules, policies, or practices" to ensure that disabled students are able to participate in the educational program. In addition, they must remove "architectural, communication, or transportation barriers" and provide "auxiliary aids and services." Lane, 541 U.S. at 531-32 (discussing implication of 42 U.S.C. § 12131(2)).

By requiring states to make special accommodations for the disabled, Title II does impose a greater burden on states than the Fourteenth Amendment itself. Garrett, 531 U.S. at 367. Nonetheless, Title II protects against the categorical exclusion and discrimination born of irrational fears that characterized past state action with respect to disabled students. Title II directs states to make reasonable changes to their programs so that otherwise qualified disabled students can participate in public education. In addition, Title II addresses the fact that physical barriers historically perpetuated the exclusion of disabled students. See Garrett, 531 U.S. at 391 (App. C. to opinion of Breyer, J., dissenting) (collecting dozens of reports of the inaccessible facilities and programs at public schools and state universities) (cited in Lane, 541 U.S. at 526).

Title II's implementing regulations and the case law interpreting the Act demonstrate that the obligations imposed by

Title II are limited in several ways that minimize the compliance costs imposed on states. States need not make structural changes to existing physical facilities if other methods can make the program or service accessible. 28 C.F.R. § 35.150(b) (2006). Furthermore, Title II requires only "reasonable modifications" to programs and facilities and "in no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service." Lane at 532 (citing 28 C.F.R. §§ 35.150(a)(2), (a)(3) (2003)); 28 C.F.R. § 35.130(b)(7). A state may take into account its limited resources as well as the needs of other students with disabilities in determining what sorts of reasonable modifications are appropriate under Title II. Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 604, 607 (1999). Finally, the ADA does not require public schools and universities to accommodate disabled students if the accommodation would substantially alter their programs or lower academic standards, and courts give due deference to the judgment of education officials on these matters. See Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 152-53 (1st Cir. 1998); Darian v. Univ. of Mass. Boston, 980 F. Supp. 77, 88-89 (D. Mass. 1997).

The other appellate courts that have considered whether Title II validly abrogates state sovereign immunity in the context of public education have concluded that it satisfies the City of

-27-

Boerne inquiry. See Ass'n for Disabled Americans v. Fla. Int'l Univ., 405 F.3d 954, 959 (11th Cir. 2005); Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 490 (4th Cir. 2005). As the Eleventh Circuit emphasized in reaching its holding, "Discrimination against disabled students in education affects disabled persons' future ability to exercise and participate in the most basic rights and responsibilities of citizenship, such as voting and participation in public programs and services." Ass'n for Disabled Americans, 405 F.3d at 959.

We are similarly persuaded that Title II's prophylactic measures are justified by the persistent pattern of exclusion and irrational treatment of disabled students in public education, coupled with the gravity of the harm worked by such discrimination. Title II's provisions are consonant with the recognition in Plyler v. Doe that, without an education, individuals are deprived of "the ability to live within the structure of our civil institutions" and therefore foreclosed from "any realistic possibility that they will contribute in even the smallest way to the progress of our Nation." 457 U.S. at 223. Title II creates an affirmative obligation for states to "reasonably modify" their programs so as to accommodate the "otherwise qualified" disabled students of this nation. This obligation is not disproportionate to the need to protect against the outright exclusion and irrational disability discrimination that such students experienced in the recent past.

-28-

## VI.

For the above reasons, we conclude that Title II, as it applies to the class of cases implicating the right of access to public education, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment. Accordingly, state sovereign immunity is not a defense to this action, and we affirm the district court's decision to reinstate Toledo's Title II claims. Without a doubt, the district court will face further issues in evaluating Toledo's claim for relief, but as the University is not entitled to sovereign immunity, those issues must be addressed in further proceedings.

**Affirmed**.