# United States Court of Appeals
## For the First Circuit

No. 09-2314

DR. JESÚS IRIZARRY-MORA,

Plaintiff, Appellant,

v.

UNIVERSITY OF PUERTO RICO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Torruella, Lipez, and Thompson, Circuit Judges.

Edelmiro Salas González for appellant.
Oreste R. Ramos Pruetzel, with whom Julio Nigaglioni Arrache
and Laura B. Arroyo-Lugo were on brief, for appellee.

July 21, 2011

**LIPEZ**, **Circuit Judge**.    Adhering to longstanding precedent, the district court dismissed this age discrimination action against the University of Puerto Rico ("University" or "UPR") on the ground that the University is an arm of the state entitled to Eleventh Amendment immunity from suit in federal court. On appeal, the plaintiff asserts that this circuit's test for analyzing whether a public entity is an arm of the state has changed in recent years, and he argues that the University does not qualify for that status under current law.  Detecting no error in the court's analysis, we affirm.

## I.

We recount only briefly the underlying facts alleged in the complaint, as the details of the alleged discrimination play no role in our analysis.  Plaintiff Jesús Irizarry-Mora ("Irizarry"), a sociologist with a Ph.D. in population planning, applied during the second semester of the 2005-2006 academic year to be an Assistant Professor at the University of Puerto Rico.  He was not chosen for the position.  A job announcement seeking candidates for the position of Assistant Professor of Sociology was again published during the fall semester of the next academic year. Irizarry reapplied, and he again was not selected.  The individual hired for the position was thirty years old.  At the time Irizarry filed this lawsuit in 2008, he was forty-eight.

Irizarry alleged in his complaint that the UPR discriminated against him on the basis of his age and retaliated against him for filing discrimination charges, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a), (d). The University moved to dismiss the complaint for lack of subject matter jurisdiction, asserting that the UPR is an arm of the state and thus entitled to immunity from suit in federal court under the Eleventh Amendment. See Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 39 (1994); Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 59 (1st Cir. 2003).

In ruling on the motion to dismiss, the district court observed that the District of Puerto Rico and the First Circuit had "consistently concluded that the UPR is an instrumentality of the state for Eleventh Amendment purposes and, as such, is not amenable to suit in federal court." Irizarry-Mora v. Univ. of P.R., No. 3:08-cv-2004-ADC, slip op. at 5 (D.P.R. Aug. 24, 2009). The court rejected Irizarry's argument that our decision in Fresenius had set out a "totally new test" for identifying an arm of the state and thus cast doubt on the validity of earlier precedent. The court further noted that the District of Puerto Rico had reexamined the UPR's status on numerous occasions after Fresenius and had "declined to depart from the 'well settled proposition' that the UPR is immune from suit in federal court." Id. (quoting Montalvo-

Padilla v. Univ. of P.R., 492 F. Supp. 2d 36, 44 (D.P.R. 2007)).
The court also pointed to the First Circuit's reiteration after
Fresenius, "albeit in passing, that the UPR is an arm of the
Commonwealth and shares its sovereign immunity."  Id. (citing
Montalvo-Padilla, 492 F. Supp. 2d at 44 (citing Toledo v. Sánchez,
454 F.3d 24, 31 n.1 (1st Cir. 2006); Aponte-Torres v. Univ. of
P.R., 445 F.3d 50, 55 (1st Cir. 2006))).

Notwithstanding the precedent weighing against the
plaintiff's position, the district court went on to perform its own
thoughtful evaluation of the arm-of-the-state factors prescribed in
the case law.  See infra Section II.  It agreed with the previous
decisions in concluding that the UPR is entitled to immunity from
suit in federal court.  Hence, it dismissed Irizarry's action, and
this appeal followed.[1]

---

[1] The district court also rejected Irizarry's request for
equitable relief under the Ex Parte Young doctrine, which allows
prospective injunctive relief against state officers who are sued
in their official capacities.  See Ex Parte Young, 209 U.S. 123
(1908); Negrón-Almeda v. Santiago, 579 F.3d 45, 52 (1st Cir. 2009).
Irizarry's suit names as a defendant only the University, not any
individuals.  In the absence of consent, waiver, or abrogation, the
Eleventh Amendment bars suit against states themselves regardless
of the form of relief sought.  Pennhurst State Sch. & Hosp. v.
Halderman, 465 U.S. 89, 100 (1984); Metcalf & Eddy, Inc. v. P.R.
Aqueduct & Sewer Auth., 991 F.2d 935, 938 (1st Cir. 1993); see also
Torres-Álamo v. Puerto Rico, 502 F.3d 20, 24 (1st Cir. 2007)
(noting that the Commonwealth of Puerto Rico is treated as a state
for purposes of the Eleventh Amendment).  In his reply brief,
Irizarry states that he does not challenge the court's ruling on
injunctive relief.

-4-

## II.

### A. Legal Background

Before our 2006 decision in <u>Fresenius</u>, this court for more than a decade had assessed an entity's arm-of-the-state status under a multi-factor test that was set out in <u>Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Authority</u>, 991 F.2d 935, 939-40 (1st Cir. 1993). In <u>Fresenius</u>, we examined Supreme Court decisions that had "updated and clarified the arm-of-the-state doctrine" in the years since <u>Metcalf & Eddy</u> to determine "whether those opinions cause us to reshape the <u>Metcalf & Eddy</u> test." <u>Fresenius</u>, 322 F.3d at 63. Concluding that a reshaping was appropriate, <u>id.</u> at 59, we relied primarily on the Court's decision in <u>Hess</u> to reformulate our analysis as a two-part inquiry whose steps reflected the Eleventh Amendment's twin concerns for the States' dignity and their financial solvency. <u>Fresenius</u>, 322 F.3d at 63, 68. Under that "two-stage framework,"

> a court must first determine whether the state has indicated an intention – either explicitly by statute or implicitly through the structure of the entity – that the entity share the state's sovereign immunity. If no explicit indication exists, the court must consider the structural indicators of the state's intention. If these point in different directions, the court must proceed to the second stage and consider whether the state's treasury would be at risk in the event of an adverse judgment.

Redondo Constr. Corp. v. P.R. Highway & Transp. Auth., 357 F.3d 124, 126 (1st Cir. 2004) (citation omitted); see also Fresenius, 322 F.3d at 65-66.

Appellant asserts that this evolution of the law means that arm-of-the-state determinations predating Fresenius are no longer binding. That argument, however, fails to recognize that we explicitly stated in Fresenius that the "reshaping" of our law did not represent an actual change in the substance of the analysis. We observed that Hess had "refined" the Metcalf & Eddy analysis, which we described as "consistent with Hess." Fresenius, 322 F.3d at 68. Indeed, we observed that Metcalf & Eddy "presciently predicted the ways in which the Supreme Court would view the issue." Id. at 62.

The "reshaping" effected in Fresenius was the replacement of Metcalf & Eddy's multi-factor test with the Supreme Court's two-part inquiry: first, the structural prong and, if necessary, the impact-on-the-treasury prong. The specific considerations remained essentially the same, however, because the Metcalf & Eddy factors covered elements relevant to both the agency's operational autonomy and its fiscal independence.[2] Although the inquiry was

---

[2] We listed the following seven factors in Metcalf & Eddy:

(1) whether the agency has the funding power to enable it to satisfy judgments without direct state participation or guarantees; (2) whether the agency's function is governmental or proprietary; (3) whether the agency is separately incorporated; (4) whether the state exerts

-6-

not framed as a progression from one stage to the next, as in Fresenius and Hess, the same "two key questions" and the same types of factors informed our analysis.[3]  Fresenius, 322 F.3d at 68. Hence, Fresenius was not a turning point in our Eleventh Amendment jurisprudence.  Rather, our course was fixed in Metcalf & Eddy,

---

control over the agency, and if so, to what extent; (5) whether the agency has the power to sue, be sued, and enter contracts in its own name and right; (6) whether the agency's property is subject to state taxation; and (7) whether the state has immunized itself from responsibility for the agency's acts or omissions.

991 F.2d at 939-40.

[3]  Under Hess, as described in Fresenius, the relevant structural considerations include:

(1) extent of state control including through the appointment of board members and the state's power to veto board actions or enlarge the entity's responsibilities; (2) how the enabling and implementing legislation characterized the entity and how the state courts have viewed the entity; (3) whether the entity's functions are readily classifiable as state functions or local or non-governmental functions; and (4) whether the state bore legal liability for the entity's debts.

Fresenius, 322 F.3d at 65 n.7 (citing Hess, 513 U.S. at 44-46).

The relevant considerations on the fiscal relationship include:

whether the state laws impose an obligation on the state to be responsible for payment of judgments against the entity (on this point federal courts are not free to assume that a state will voluntarily assume the payment of the entity's debts if the entity is in need); other sources of revenue for the entity; and whether the agency is so structured that, as a practical matter, the state anticipated budget shortfalls that would render the entity constantly dependent on the state.

Fresenius, 322 F.3d at 65 n.8 (citing Hess, 513 U.S. at 49-50).

which "foreshadowed" Hess in determining that "when there is ambiguity from the structure about whether an entity is an arm of the state, the primary focus is on the risk to the state treasury." Id. at 66.

Arguably, our conclusion that the substance of the law did not change in Fresenius is enough to resolve this case. We observed in Metcalf & Eddy that "[w]here the agency's activity and its relation to the state remain essentially the same, prior circuit precedent will be controlling." 991 F.2d at 940 n.4. Indeed, the UPR has been deemed an arm of the state for more than three decades, see Pinto v. Universidad de P.R., 895 F.2d 18, 18 (1st Cir. 1990); Perez v. Rodriguez Bou, 575 F.2d 21, 25 (1st Cir. 1978), and no factual change in its relationship with the Commonwealth is asserted. The principle of stare decisis thus has considerable force here.

Nonetheless, we recognize that the original precedent on the UPR's status predates even Metcalf & Eddy. In addition, although we have assumed the continuing validity of that precedent at least twice since Fresenius, the Eleventh Amendment was not a live issue in either case. See Toledo, 454 F.3d at 31 n.1, 40 (finding that the UPR was not entitled to immunity for the particular claims at issue); Aponte-Torres, 445 F.3d at 53, 55 (holding that the plaintiffs "fail[ed] to articulate a cognizable federal claim"). Thus, like the district court, we think brief

-8-

consideration of the two-part <u>Fresenius</u> inquiry is warranted to confirm that our precedent is in line with current law.[4]

## B. Application of the Arm-of-the-State Test

### 1. Structural Factors

The distinctive, public-oriented role that a state university typically plays in its state's higher education landscape undoubtedly accounts for the fact that "the vast majority of state universities . . . have been found to be 'arms' of the State." <u>See</u> <u>Univ. of R.I.</u> v. <u>A.W. Chesterton Co.</u>, 2 F.3d 1200, 1204 (1st Cir. 1993); <u>see</u> <u>also</u> 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, <u>Federal Practice & Procedure</u> § 3524.2, at 325-32 (2008) (noting that "state universities usually are considered arms of the state"). Each state university nonetheless "must be evaluated in light of its unique characteristics." <u>A.W. Chesterton</u>, 2 F.3d at 1204.

Although Puerto Rico law contains no explicit statement of intention that the University share the Commonwealth's sovereign

---

[4] The district court dismissed the case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), although it referenced documents outside the complaint. Whether the court's ruling is treated as a dismissal under Rule 12(b) or a grant of summary judgment, our standard of review is de novo. <u>See</u> <u>Wojcik</u> v. <u>Mass. State Lottery Comm'n</u>, 300 F.3d 92, 98 (1st Cir. 2002) (stating that application of "the immunity doctrine under the Eleventh Amendment is a question of law that engenders <u>de</u> <u>novo</u> review on appeal"). In either case, we also view the record in the light most favorable to the non-moving party. <u>See</u> <u>McCloskey</u> v. <u>Mueller</u>, 446 F.3d 262, 266 (1st Cir. 2006) (Rules 12(b)(1) and 12(b)(6)); <u>Fresenius</u>, 322 F.3d at 68 (summary judgment).

immunity, statutory provisions and case law together describe a public role for the University consistent with such a relationship. By statute, the UPR has an "obligation of service to the people of Puerto Rico," P.R. Laws Ann., tit. 18, § 601(a), and it is exempted from the payment of taxes because it "achieves a public purpose of the Commonwealth." Id. § 612(f).

The UPR's important public role also has been acknowledged by the Puerto Rico Supreme Court. In University of Puerto Rico v. Puerto Rico Association of University Professors, 136 P.R. Dec. 335, No. JR-91-103 (June 13, 1994),[5] the court noted the UPR's obligation "[a]s a university of the State . . . to serve the People of Puerto Rico," Unoff. Trans. at 44 (quotation marks omitted), and it rejected a suggestion that the UPR could increase fees to the same extent as could a private university in order to raise revenue:

> For evident reasons, increasing the costs of registration so substantially would create very serious problems concerning the role played by U.P.R. in Puerto Rico's society, not to mention those related to its implementation. An increase like the Board suggests, sufficiently high so as to convert the U.P.R. into a profitable operation, would cause serious problems, for example, concerning students. It would affect both the capacity of our young ones to obtain good quality higher education as well as the U.P.R.'s capacity to fulfill its statutory mission of developing the intellectual and

---

[5] The parties stipulated to a partial translation of this case, and our citations will be to that unofficial translation.

-10-

spiritual wealth of our people, "especially those less favored in terms of financial resources." 18 L.P.R.A. sec. 601(b)(4).[6]

Id. at 45 (emphasis omitted).[7] The Commonwealth's reliance on the UPR to make higher education accessible to students for whom the government feels a special responsibility is also shown by a specific UPR tuition exemption for the children of Puerto Rico military members who have died in action, remain missing, or are prisoners of war. See P.R. Laws Ann. tit. 18, § 612(b).

In further support of the proposition that the University is an arm of the Commonwealth, we note that ten of the thirteen members of its governing board are appointed by the governor, with the advice and consent of the Puerto Rico Senate, P.R. Laws Ann.

_____

[6] Section 601 lists the objectives of the University of Puerto Rico and directs the University to, inter alia,

[f]ully develop the intellectual and spiritual wealth latent in our people, so that the values of the intelligence and spirit of the exceptional personalities that arise from all social sectors, especially those least favored in economic resources, may be put to the service of the Puerto Rican community.

P.R. Laws Ann. tit. 18, § 601(b)(4).

[7] Although the Puerto Rico Supreme Court's ruling does not directly address the question of sovereign immunity and would not, in any event, be dispositive on the question, its observations are pertinent to our attempt to divine legislative intent. See Redondo Constr. Corp., 357 F.3d at 128 (noting that, "'[w]hile not dispositive, consistent decisions of a state's highest court construing an agency's or institution's relationship with the central government are important guideposts in a reasoned attempt to locate the agency's or institution's place within the scheme of things.'" (alteration in original) (quoting Metcalf & Eddy, 991 F.2d at 942)).

-11-

tit. 18, § 602(b)(1),[8] and the Board originally was convened by the Secretary of Education, id. § 602(b)(4). See Pastrana-Torres v. Corporación de P.R. para la Difusión Pública, 460 F.3d 124, 127 (1st Cir. 2006) (noting that Commonwealth control is indicated where board comprised of government officials and private citizens is appointed by the governor and confirmed by the Senate); A.W. Chesterton Co., 2 F.3d at 1207 (noting that appointment of ten of thirteen board members by the governor with consent of Senate is "a legislative design most courts routinely view as evidence of an entity's lack of independence from State control") (citing cases).[9] The Board of Trustees plays a significant role in governing the University, including appointing the President and Chancellors, in consultation with academic senates, P.R. Laws Ann. tit. 18, § 602(e)(7), and "supervis[ing] the general progress of the institution," id. § 602 (d). The Board also approves the

_____

[8] The three other members consist of one student and two faculty members, who are elected by their peers to serve one-year terms. P.R. Laws Ann. tit. 18, § 602(b)(1) & (2). The governor's appointees serve staggered six-year terms. Id. § 602(b)(2).

[9] We observed in Fresenius that "[t]he governor's appointment power over the board is not enough in itself to establish that [an entity] is an arm of the state." 322 F.3d at 71. In fact, where, as here, the governor-appointed board members serve terms potentially longer than a governor's tenure and may "only be discharged after determination of just cause after filing charges," P.R. Laws Ann. tit. 18, § 602(b)(2), the trustees are insulated "to some degree" from political pressure, and the University's independence is accordingly increased. See A.W. Chesterton Co., 2 F.3d at 1208. It remains structurally significant, however, that the University's governing authority resides primarily in individuals appointed by the governor.

university system's annual budget and the appointment of the Finance Director, and it is charged with "[r]ender[ing] a yearly report to the Governor and the Legislature concerning its activities and the status and finances of the University." Id. § 602 (e)(8), (9), (10).

These structural signals strongly indicate that the Commonwealth's "'dignity' interest as a sovereign in not being haled into federal court" embraces the University. See Fresenius, 322 F.3d at 63. Yet we acknowledge that the UPR also possesses attributes of an autonomous agency. It controls and may acquire its own properties, it may create subsidiary corporations, and its debts are by law not considered those of the Commonwealth. See P.R. Laws Ann. tit. 18, §§ 612(a), 602(e)(19), 612(f), 822. As appellant argues, the University has "a significant degree of autonomy" to set policy, see id. §§ 602(d), 603(a),[10] and the UPR is authorized to borrow money "for any of its purposes and activities" by issuing bonds or notes, id. § 612(e). It also has authority to raise revenue by charging tuition and other fees, id.

---

[10] Section 602(d), titled "Powers and duties," states that "[t]he Board shall formulate the directives which shall govern the direction and development of the University, it shall examine and approve the general operational standards proposed by the legislative and administrative bodies of the latter, . . . and shall supervise the general progress of the institution."
Section 603(a) states that the University "shall function with academic and administrative autonomy within the standards provided by this chapter and those that may be set forth in the University regulations or in resolutions of the Board of Trustees."

§ 612(b),[11] and to spend the proceeds generated from such sources, as well as from the sale of property and donations, "in the best interest of the University," id. § 612(c). Although the University is expressly authorized to issue bonds "for the purpose of acquiring or constructing any project," such revenue bonds "shall not constitute a debt of the Commonwealth of Puerto Rico" and shall not "pledge the good faith and credit of the Commonwealth." Id. § 822.

The authority to conduct day-to-day operations is not necessarily inconsistent with a conclusion that the Commonwealth intends the UPR to share its sovereign status. See, e.g., Kashani v. Purdue Univ., 813 F.2d 843, 847 (7th Cir. 1987) ("[T]hese powers are granted the university only so that it is able to carry out its primary purpose of education, in contrast to a city or county, whose exercise of such powers . . . is its very raison d'etre."). Yet, some of the structural indicators unquestionably point in the other direction. We thus think it prudent to proceed to the second stage of the Eleventh Amendment inquiry "and consider whether the state's treasury would be at risk in the event of an adverse judgment." Redondo Constr. Corp., 357 F.3d at 126.

---

[11] As the Puerto Rico Supreme Court observed in the passage quoted above, however, the power to assess tuition and fees may as a practical matter be limited by the UPR's mission to serve "especially those least favored in economic resources," P.R. Laws Ann. tit. 18, § 601(b)(4). See P.R. Ass'n of Univ. Profs., 136 P.R. Dec. 335, Unoff. Trans. at 45.

2.  Impact on the Treasury

It is undisputed that the Commonwealth provides the bulk of the funding for the University's operations.  By law, the Commonwealth must dedicate 9.6% of its general fund revenues to the UPR.  P.R. Laws Ann. tit. 18, § 621-1.  The parties debate what percentage of the University's budget those funds represent, but even appellant acknowledges that more than sixty percent of the UPR's funding comes from the government.  He argues that the institution's non-government funds are "more than sufficient" to satisfy any judgments, asserting that in one recent year the UPR had nearly $579 million in non-Commonwealth income.[12]  Appellant's calculations, however, patently overestimate the University's available resources by including funds that are identified as restricted in the budget document on which he relies.  Indeed, in the reported year, 2008-2009, only about one-fifth of the non-Commonwealth funds appear to have been unrestricted,[13] leaving the Commonwealth as the source for nearly ninety percent of the

_____

[12]  Appellant draws his figures from a document included in the appendix and titled "University of Puerto Rico Consolidated Budget by Funding Account" for fiscal year 2008-2009.  He reports that the document was taken from the University's annual report, as published on its website.  We rely on the same document.

[13]  Appellant asserts that the UPR's 2008-2009 budget reports nearly $579 million in income from sources other than the Commonwealth government, or thirty-seven percent of its budget. Of that sum, however, more than $258 million was in restricted federal funds, $99 million was identified as allocated to a "Permanent Improvement Program," and another $100 million of donations and self-generated revenues were labeled as restricted funds.

University's general fund.  See P.R. Ass'n of Univ. Profs., 136 P.R. Dec. 335, Unoff. Trans. at 42 (observing that, at the time of the decision in 1994, eighty-six percent of the University's budget came from the General Fund of the Commonwealth).

More importantly, however, the University's status cannot turn on whether its budget shows enough non-Commonwealth income to allow it, in theory, to pay a court judgment.  Allocating any portion of the University's general fund revenues to court judgments not only would dilute the impact of the public funds the UPR receives, but such damage awards also would diminish the University's ability to comply with its statutory mission to provide "good quality higher education" for all residents of Puerto Rico.  Id. at 45.[14]  The UPR does not have the flexibility to offset

---

[14] In both Fresenius and Metcalf & Eddy, we emphasized that "a state agency cannot claim Eleventh Amendment immunity solely on the basis that judgments against it may absorb unrestricted funds donated by the state and, in that way, redound indirectly to the depletion of the state's treasury."  Metcalf & Eddy, 991 F.2d at 941; see also Fresenius, 322 F.3d at 75.  That description does not apply to the significantly different financial circumstances here.  In Metcalf & Eddy, the agency at issue received some government funding but was largely financed by user fees and bonds.  991 F.2d at 940.  Similarly, in Fresenius, most of the agency's funding came from "sources other than the Commonwealth's treasury."  322 F.3d at 72.
   Contrary to appellant's suggestion, the Commonwealth's 2009 fiscal stabilization act has no effect on our analysis as it did not change the financial relationship between the Commonwealth and the University.  It excluded new revenues raised under the Act from the statutory 9.6 percent funding formula so that such revenues could be "expressly directed to reducing the structural deficit of the Central Government."  2009 P.R. Laws Act No. 7, Statement of Motives ("Special Act to Declare a State of Fiscal Emergency and to Establish a Comprehensive Fiscal Stabilization Plan to Salvage the

unanticipated expenses by passing the additional costs on to its customers.  See id.; cf. Metcalf & Eddy, 991 F.2d at 940 ("Although the central government subsidizes the agency to some extent, [the agency] relies mostly on user fees and bonds to support its operations.").  Because providing affordable higher education for Puerto Rico residents is the Commonwealth's goal, the Commonwealth must as a practical matter ensure the University's financial viability – regardless of its responsibility for particular University debts.  We suggested as much in Fresenius, where we observed that the Commonwealth may indirectly assume the obligation for an entity's debts "by providing virtually all the funds needed for [its] operation."  322 F.3d at 72; see also Pastrana-Torres, 460 F.3d at 128 (same); Metcalf & Eddy, 991 F.2d at 941 (quoting Blake v. Kline, 612 F.2d 718, 723 (3d Cir. 1979), for the proposition that "'the nature of the state's obligation to contribute may be more important than the size of the contribution'").

In sum, the Commonwealth's investment, financial and otherwise, in the UPR's ability to fulfill its "obligation of service to the people of Puerto Rico," P.R. Laws Ann. tit. 18, § 601(a), puts Commonwealth funds at risk when University funds are at risk.  Hence, we are comfortable that our longstanding precedent remains consistent with current Eleventh Amendment principles.

_____

Credit of Puerto Rico").

-17-

Accordingly, we **affirm** the district court's judgment dismissing this action on the ground that appellant's claims are foreclosed by the Eleventh Amendment.

So ordered.