**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 11, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STUART T. GUTTMAN, M.D.,

       Plaintiff-Appellant,

v.

G.T.S. KHALSA; LIVINGSTON
PARSONS; and THE STATE OF
NEW MEXICO,

       Defendants-Appellees.

————————————————

UNITED STATES OF AMERICA,

       Intervenor-Appellant.

Nos. 10-2167 and 10-2172

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 2:03-CV-463-MCA-KBM)**

---

Ian D. McKelvy, Sanders, Bruin, Coll & Worley, P.A., Roswell, New Mexico, for Plaintiff-Appellant.

Dirk C. Phillips, Attorney, Appellate Section, Civil Rights Division (Thomas E. Perez, Assistant Attorney General, and Diana K. Flynn, with him on the briefs), United States Department of Justice, Washington, District of Columbia, for Intervenor-Appellant.

Thomas C. Bird (Sean Olivas and Neil R. Bell, with him on the brief), Keleher & McLeod, P.A., Albuquerque, New Mexico, for Defendants-Appellees.

Before **BRISCOE**, Chief Judge, and **EBEL** and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

The question presented in this appeal is whether the Eleventh Amendment protects New Mexico from a suit for money damages under Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12131–65. We conclude it does. New Mexico has state sovereign immunity from a claim that it violated the ADA when it revoked the medical license of a physician whose practice the state claimed constituted an imminent danger to the public.

As a result, we find the district court did not err by dismissing the ADA claim of the appellant, Dr. Stuart Guttman, against the State of New Mexico for revoking his medical license. We also conclude the state's actions did not violate the United States Constitution. But after a careful review of the record, it appears that Guttman may still have extant claims for prospective injunctive relief.

Having jurisdiction under 28 U.S.C. § 1291, we therefore AFFIRM in part, REVERSE in part, and REMAND for further consideration of the claim for injunctive relief against the individual defendants on the basis of the alleged ADA violation.

## BACKGROUND

The factual and procedural background of this case is complex, and has been extensively recounted in four prior opinions. *See Guttman v. Khalsa*, 320 F. Supp. 2d 1164 (D.N.M. 2003) (*Guttman I*); *Guttman v. Khalsa*, 401 F.3d 1170 (10th Cir. 2005) (*Guttman II*); *Guttman v. Khalsa*, 446 F.3d 1027 (10th Cir. 2006) (*Guttman III*); *Guttman v. New Mexico*, 325 F. App'x 687 (10th Cir. 2009) (*Guttman IV*). Thus, we provide only a summary of the underlying facts and procedural history relevant to this appeal.

### I. Board of Medical Examiners

Stuart Guttman is a physician with a history of depression and post-traumatic stress disorder. At the time he brought this case, he was practicing medicine in Truth or Consequences, New Mexico. Before that, he practiced in Gallup, New Mexico, and also in Mississippi and Texas. Because of his medical history, when he applied for a New Mexico medical license in 1993, the New Mexico Board of Medical Examiners (the Board) initially granted him only a qualified medical license, subject to quarterly reports by his psychiatrist and other conditions. The Board removed these requirements in 1995.

Four years later, after receiving many complaints about Guttman, the Board directed him to meet with an Impaired Physician Committee (IPC). The IPC consisted of an anesthesiologist and two psychiatrists. Before meeting Guttman, the IPC reviewed reports of his conduct in Truth or Consequences, which

indicated that his problems interacting with others had caused disruptions among healthcare providers.

The IPC then interviewed Guttman. During that meeting, Guttman allegedly told the IPC that no complaints had been filed against him in either Gallup or Texas. Nevertheless, the IPC recommended the Board further investigate Guttman's conduct in those locations. Two weeks later, the IPC received materials from Gallup indicating numerous complaints against Guttman by patients, their families, and hospital staff. The IPC also learned Guttman had been sued for malpractice and that a Gallup hospital had denied him staff privileges. In response, the IPC reported to the Board that Guttman's interpersonal problems were serious and "certainly [had] a deleterious influence on his ability to diagnose and manage patients." R. at 217. The IPC also concluded Guttman's behavior was neither "situation nor place related." *Id.*

In March 2000, the Board summarily suspended Guttman's license after finding clear and convincing evidence that "Guttman's continuation in practice would constitute an imminent danger to public safety." *Id.* at 303. Following the suspension, the Board conducted a three-day administrative hearing to take evidence on whether the suspension should be made permanent. Guttman participated in the hearing with the assistance of counsel. As an alternative to revocation, Guttman proposed more stringent stipulations on his license, but the

IPC members testified they could envision no restrictions that would enable Guttman to practice medicine safely.

In February 2001, after recognizing an extensive pattern of disruptive and abusive behavior by Guttman in dealing with patients and healthcare professionals, the Board revoked his license. The Board also found that further treatment of his mental health problems was unlikely to succeed, and that Guttman's inability to interact professionally with others posed a danger to his patients.

## II.  State and Federal Court Proceedings

Guttman challenged the Board's findings in state court, asserting for the first time that the Board's actions violated Title II of the ADA.  Because Guttman had not raised an ADA claim before the Board, the state court refused to consider it and affirmed the revocation of his license.  Guttman then petitioned both the New Mexico Court of Appeals and the New Mexico Supreme Court for review, but they did not disturb the lower court's holding.

While his petition to the New Mexico Supreme Court was pending, Guttman filed a pro se complaint in federal district court against New Mexico and two individuals: G.T.S. Khalsa, the Board's administrative prosecutor, and Livingston Parsons, the Board's hearing officer.  The district court granted the defendants' motion for summary judgment after finding (1) the individual defendants were entitled to absolute immunity, and (2) the *Rooker-Feldman*

doctrine prohibited consideration of Guttman's Title II claim.[1] *Guttman I*, 320 F. Supp. 2d at 1164. We affirmed, but the Supreme Court granted certiorari and vacated our judgment in light of *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005). *Guttman II*, 401 F.3d at 1170, *vacated and remanded,* 546 U.S. 801 (2005).

On remand, after finding the district court had subject matter jurisdiction to hear the case, we upheld the district court's ruling that Khalsa and Parsons were entitled to absolute immunity. But we remanded the case to determine, in light of *Tennessee v. Lane*, 541 U.S. 509 (2004), and *United States v. Georgia*, 546 U.S. 151 (2006), whether Title II of the ADA validly abrogated sovereign immunity in the area relevant to this controversy. *Guttman III*, 446 F.3d at 1027, 1035–36.

After we issued *Guttman III*, Guttman filed an amended complaint, which contained the following claims under Title II and 42 U.S.C. § 1983: (1) an ADA claim, (2) an equal protection claim, (3) a procedural due process claim, (4) a First Amendment retaliation claim, (5) a "defamation and false data bank report" claim, which Guttman now calls a "stigma plus" claim, and (6) a claim for injunctive relief. The amended complaint's principal alterations were the addition

---

[1] *Rooker-Feldman* doctrine, which was enunciated by the Supreme Court in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), prohibits "state-court losers" from bringing suit in federal court "complaining of injuries caused by state court judgments rendered before [parallel federal] district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

of the injunctive relief claim and a reference to Khalsa and Parsons in their official capacities.

The district court considered the claims against New Mexico and the individual defendants separately, in a series of memorandum opinions and orders. In October 2006, the court again granted the Board members' motion to dismiss, holding they were entitled to absolute immunity for all claims under Title II and § 1983. R. at 69–88. But after a request to reconsider the dismissal, the court restored the stigma-plus claim and clarified that it was the only claim remaining against the individual defendants. *Id.* at 89–92. Finally, in June 2007, the court granted the individual defendants' motion to dismiss in toto, holding they were entitled to qualified immunity on that last remaining claim. *Id.* at 100–17.

With regard to Guttman's Title II claim against New Mexico, the district court found he had alleged sufficient facts to demonstrate a protected disability under Title II and concluded the sovereign immunity analysis would be "more appropriate for a decision at a later stage," because "a decision will require some development of the facts." *Id.* at 72. New Mexico timely filed an interlocutory appeal. We vacated the district court's denial of the State's motion to dismiss and remanded for consideration of the sovereign immunity issue. *Guttman IV*, 325 F. App'x at 690–92.

In March 2010, after finally considering New Mexico's Eleventh Amendment claim, the district court concluded that Title II did not validly

abrogate state sovereign immunity because its remedy was not proportional to a pattern of unconstitutional state action in the area of professional licensing. Although the district court permitted Guttman to file a second amended complaint, the court later concluded the only remaining claim for which a ruling had not been made was Guttman's First Amendment retaliation claim against New Mexico, which it dismissed. And after finding all of Guttman's claims had been resolved, the district court granted the defendant's motion to dismiss the second amended complaint.

## ANALYSIS

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). Title II authorizes suits by private citizens for money damages against public entities that violate § 12132. *See id.* § 12133 (incorporating by reference 29 U.S.C. § 794a).

-8-

Two questions are before us in this appeal: (1) whether Guttman can proceed on his Title II claim against New Mexico, and (2) whether any claims against the individual defendants remain.

## I. Preclusion and Waiver

Before addressing the merits of the sovereign immunity question, we must resolve two preliminary issues. First, New Mexico contends Guttman is collaterally estopped from bringing his Title II claim because the Board made a factual determination regarding his competency to practice medicine, and the state trial court affirmed the Board's order. Second, Guttman claims New Mexico waived its defense of sovereign immunity when responding to the complaint.

### A. Collateral Estoppel

We review de novo the district court's application of the doctrine of collateral estoppel, which is also known as issue preclusion. *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1197 (10th Cir. 2000). "[Collateral estoppel] means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Federal courts give state agency determinations the same preclusive effect that the forum state's courts would afford them. *University of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986). Under New Mexico law, collateral estoppel bars re-litigation of the same issue if

-9-

> (1) the party to be estopped was a party to the prior proceeding, (2) the cause of action in the case presently before the court is different from the cause of action in the prior adjudication, (3) the issue was actually litigated in the prior adjudication, and (4) the issue was necessarily determined in the prior litigation.

*Ideal v. Burlington Res. Oil & Gas Co.*, 233 P.3d 362, 365–66 (N.M. 2010) (quoting *Shovelin v. Cent. N.M. Elec. Coop., Inc.*, 850 P.2d 996, 1000 (N.M. 1993)).

The state defendants contend the question of whether Guttman's disability could be reasonably accommodated is necessarily precluded by the outcome of the Board's factual determinations regarding his competency to practice medicine and the state trial court's decision affirming the Board's order. They argue these determinations prevent Guttman from establishing an essential element to an ADA claim—that he is a "qualified individual with a disability" under § 12131(2)—because "[a] physician whose mental condition poses a risk to the public cannot practice medicine with reasonable skill and safety." Aple. Br. at 46 (citing *Alexander v. Margolis*, 921 F. Supp. 482, 488–89 (W.D. Mich. 1995), *aff'd* 98 F.3d 1341 (6th Cir. 1996)). The district court declined to dismiss Guttman's complaint on collateral estoppel grounds after concluding the issue would be more appropriately addressed in the context of a summary judgment motion. R. at 372.

We agree with the district court for two reasons. First, as far as we can tell from the record, the Board may not have established that Guttman was not a

-10-

qualified individual under the ADA. A qualified individual is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aides and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). The Board may have established *only* that Guttman has a disability. Indeed, although the Board found "[p]rior therapeutic treatment has not been effective in changing [Guttman]'s behavior, and further treatment would not likely be effective in changing his behavior," R. at 333, this is not the same as a finding that the behavior cannot be reasonably accommodated under the ADA. Rather, it may be possible to accommodate a disability without resolving the disability itself. For example, during the Board's administrative hearing, Guttman proposed stipulations on his license that would restrict him to a solo practice in an outpatient, clinical setting. These restrictions were intended to accommodate Guttman's disability not by changing his behavior, but by ameliorating its effect. As a result, we cannot conclude on this record the exact issue of accommodation was actually litigated in the prior adjudication. Factual questions regarding whether Guttman is a qualified individual who can be reasonably accommodated still preclude us from finding issue preclusion as a matter of law. And since Guttman did not raise his ADA claim in the revocation hearing—which would have alerted the Board that it

-11-

should address the possibility of reasonable accommodation under the statute—we cannot be sure this issue was necessarily determined when the Board revoked Guttman's license.

Given that the Board made no finding on the issue of accommodation, defendants may prevail on their collateral estoppel defense only if they can show that an individual with Guttman's disability is unable to be accommodated as a matter of law. To this end, defendants point to *Alexander*, 98 F.3d at 1341, but that case provides no support on this issue. In summarily affirming the district court's decision, the Sixth Circuit merely noted the plaintiff had failed to prove he met the statutory standard, without explaining why. *See id.* Likewise, *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1266 (4th Cir. 1995), provides no support for the fact that it would be categorically impossible to accommodate a person with Guttman's disability. So even if we were to give preclusive effect to the Board's finding that Guttman posed an imminent danger to public safety, this alone does not decide the issue of accommodation, and it would not prevent Guttman from filing a Title II claim.

In summary, we agree with the district court that New Mexico has failed to establish in its motion to dismiss that Guttman is precluded from raising his Title II claim.

## B. Waiver of Sovereign Immunity

New Mexico asserted its sovereign immunity defense in its first motion to

dismiss and in many subsequent pleadings.  Nonetheless, Guttman contends New Mexico waived immunity by entering into a joint status report and provisional discovery plan.  We see no waiver.

Although a state may waive the sovereign immunity granted to it under the Eleventh Amendment, we require a showing of unequivocal intent to do so. *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1233 (10th Cir. 1999). Although it has acceded to the reality of some discovery in the early stages of litigation, New Mexico continues to preserve its sovereign immunity defense. *See* Joint Status Report and Provisional Discovery Plan at 3 ("Defendants contend that they are entitled to Eleventh Amendment immunity, absolute judicial or quasi-judicial immunity, and that the individual Defendants are entitled to qualified immunity.") (*Guttman v. Khalsa*, No. 03-cv-463-MCA-KBM (D.N.M. Jan. 1, 2007), Doc. No. 49.).  We find New Mexico did not waive its sovereign immunity defense.

## II.  Sovereign Immunity Analysis

Having determined no threshold issue allows us to resolve this case without addressing the sovereign immunity question, we now turn to the merits of that claim.

### A.  Eleventh Amendment Legal Framework and the ADA

The principle of state sovereign immunity is traceable to the earliest days of the Republic.  For example, in *Federalist No. 81*, Alexander Hamilton wrote,

"It is inherent in the nature of sovereignty [that a sovereign is] not to be amenable to the suit of an individual without its consent.  This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union.  Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States . . . ."  *The Federalist No. 81*, at 548–49 (J. Cooke ed. 1961) (A. Hamilton) (emphasis deleted); *see also Hans v. Louisiana*, 134 U.S. 1, 13 (1890) (quoting *Federalist No. 81*).

Nevertheless, in 1793, the Supreme Court concluded the original states had surrendered much of their sovereign immunity.  *Chisholm v. Georgia*, 2 Dall. 419 (1793).  The swift and immediate negative reaction to that decision led to its reversal through the ratification of the Eleventh Amendment.

The Eleventh Amendment grants immunity to the states from "any suit in law or equity, commenced or prosecuted . . . by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Although the Amendment "by its terms . . . applies only to suits against a State by citizens of another State," the Supreme Court has repeatedly held States are immune to unconsented suits brought by their own citizens as well.  *Board of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).  Thus, as the Court has consistently recognized, "That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the

-14-

construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given." *Ex parte New York*, 256 U.S. 490, 497 (1921).

Nonetheless, "Congress may . . . abrogate [state sovereign] immunity in federal court if it makes its intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 726 (2003). As it bears on the issues in this case, the Fourteenth Amendment provides:

> Section 1 . . . . No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
>
> \* \* \*
>
> Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV. The enforcement prerogative granted by § 5 gives Congress broad authority, such that it may enact "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct," so long as these measures do not work a substantive

-15-

change in the governing law. *Hibbs*, 538 U.S. at 727–28. The ADA is one such piece of prophylactic legislation.

The Supreme Court closely scrutinizes prophylactic legislation under § 5 to ensure Congress does not overreach into core state governmental functions. For "private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress [such as the ADA] must be congruent and proportional to the targeted violation." *Garrett*, 531 U.S. at 374; *see also City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). The Court has not arrived at a concrete definition of congruence and proportionality, but it is clear that Congress enjoys greater power under § 5 when it responds to a clearly discernible pattern of state encroachment on fundamental or other important constitutional rights. *See Tennessee v. Lane*, 541 U.S. 522, 529 (2004) (where a right is implicated that is subject to a heightened standard of judicial scrutiny, "it [is] easier for Congress to show a pattern of state constitutional violations than in [cases that] concern[] legislation that target[s] classifications subject to rational-basis review"). Congressional regulation is less likely to be congruent and proportional if the rights at issue are not subject to heightened judicial scrutiny. *See id.*

This case centers on the ADA's relationship to the Eleventh Amendment. Passed in 1990, the ADA seeks to vindicate the rights of the disabled. Title II of the statute forbids discrimination against the disabled in public services,

-16-

programs, and activities.[2] Title II specifies that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. Title II authorizes suits by private citizens for money damages against public entities that violate § 12132. *See id.* § 12133 (incorporating by reference 29 U.S.C. § 794a).

The Supreme Court has already addressed several Eleventh Amendment challenges to the ADA, with varying results. *See United States v. Georgia*, 546 U.S. 151 (2006); *Tennessee v. Lane*, 541 U.S. 509 (2004); *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). Most relevant here, in *Tennessee v. Lane*, 541 U.S. at 533–34, the Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." The Court, however, specifically declined to address the question "whether Title II's duty to accommodate exceeds what the Constitution requires in the class of cases that implicate only [the] prohibition on irrational discrimination." *Id.* at 532 n.20. Therefore, by its own terms, *Lane* does not resolve the specific question here: whether the accommodation requirement of

---

[2] As the Supreme Court explained in *Lane*, 541 U.S. 522–23, Title II "also seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review," including the fundamental right of access to the courts, which was at issue in *Lane*.

Title II is a valid exercise of the § 5 authority, as it applies to cases involving professional licensing.

To resolve this question, we apply the Court's three-step analysis from *United States v. Georgia*. That analysis requires us to

> determine in the first instance, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

546 U.S. at 159. Because we reach the third step of this analysis, we must also ask "whether Congress unequivocally expressed its intent to abrogate that immunity" and, "if it did, whether Congress acted pursuant to a valid grant of constitutional authority." *Lane*, 541 U.S. at 517.

Given this legal framework, we apply the test from *Georgia* to the Title II claims in this case.

### 1. Step One: The Alleged Title II Violation

The first step from *Georgia*, 546 U.S. at 159, requires us to identify the state's conduct that allegedly violated Title II's prohibition against disability discrimination in the provision of state services or programs. This assessment is easy here: the alleged Title II violation is the Board's decision to suspend and later revoke Guttman's medical license. The parties have stipulated that Guttman stated a claim under Title II.

## 2. Step Two: Fourteenth Amendment Claims

The second step requires us to assess the asserted Fourteenth Amendment claims. Guttman alleges both procedural due process and equal protection violations. If these claims allege actual constitutional violations, then New Mexico cannot raise a sovereign immunity defense because "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Georgia*, 546 U.S. at 159. If, however, the Board's actions did not violate the Fourteenth Amendment, then Guttman merely alleges violations of Title II's prohibitions against disability discrimination, and we then must proceed to the final *Georgia* step to determine if Congress validly abrogated New Mexico's sovereign immunity.

Guttman raises three possible claims grounded in the Fourteenth Amendment: (1) a procedural due process claim based on the state's failure to provide a predeprivation hearing; (2) a procedural due process claim based on procedural defects under New Mexico law; and (3) an equal protection claim based on the state's decision to treat Guttman differently than other licensed professionals.

### a. Procedural Due Process: Lack of a Deprivation Hearing

Guttman's first Fourteenth Amendment claim is that the Board violated his due process rights by not providing him a hearing before suspending his medical license.

"To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Hatfield v. Bd. of Cnty. Comm'rs,* 52 F.3d 858, 862 (10th Cir. 1995) (quotations omitted). In light of *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1150 (10th Cir. 2007), New Mexico does not contest the district court's finding that Guttman had a protected property interest in his medical license. The parties disagree, however, whether Guttman received an appropriate level of process.

Ordinarily, "one who has a protected property interest is entitled to some sort of hearing before the government acts to impair that interest, although the hearing need not necessarily provide all, or even most, of the protections afforded by a trial." *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1220 (10th Cir. 2006) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Supreme Court has repeatedly held, "where a State must act quickly, or where it would be

impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). Furthermore, "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Id.* at 930–31.

"In matters of public health and safety, the Supreme Court has long recognized that the government must act quickly. Quick action may turn out to be wrongful action, but due process requires only a postdeprivation opportunity to establish the error." *Camuglia*, 448 F.3d at 1220 (citing *North American Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 315 (1908)).

The discovery that a physician constitutes an imminent danger to public safety is precisely the kind of circumstance where the government must act quickly. Here, the Board suspended Guttman's license after finding "clear and convincing evidence that [his] continuation in practice would constitute an imminent danger to public safety." R. at 303. A few months later, the Board conducted a three-day administrative hearing, in which Guttman participated via counsel.

Because (1) the deprivation was supported by the important government interest of protecting the public, (2) clear and convincing evidence provided substantial assurance that the deprivation was not unwarranted, and (3) Guttman

-21-

was provided with adequate postdeprivation process, the Board's failure to provide Guttman a predeprivation hearing did not violate the Due Process Clause. As a result, New Mexico is not prevented from raising a sovereign immunity defense on this basis.

### b. Procedural Due Process: Defects Under State Law

Guttman next contends the Board lacked jurisdiction over his license because it failed to follow procedural requirements under state law, thereby voiding its decision. He identifies the following deficiencies that allegedly violated state law or governing procedural guidelines: (1) the medical license of one IPC member had expired; (2) the IPC held a second meeting outside of the two-week period from the time its members were appointed; (3) the IPC asked questions of the Board and the Board responded; (4) Parsons served as a hearing officer, despite having personal knowledge of Guttman and material facts; and (5) the IPC and Board relied on information dating back more than two years. Guttman relies on *Lopez v. New Mexico Board of Medical Examiners*, 754 P.2d 522, 524 (N.M. 1988), wherein the New Mexico Supreme Court held that violations of the 90-day time limit in rendering a decision under the Uniform Licensing Act, NMSA 1978, § 61-1-13— statute not at issue in this case—was jurisdictional.

There are two major flaws with Guttman's argument. First, as the district court recognized, "although the contours of a constitutional right can be defined

by state law, the question of whether a state has afforded sufficient process to protect a constitutional right is not a question of state law." R. at 359 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 540–41 (1985)). Therefore, alleged state law deficiencies, even if we accept them as true, do not signify an unconstitutional denial of process. *See Hicks v. City of Watonga*, 942 F.2d 737, 746 n.4 (10th Cir. 1991) ("A failure to comply with state or local procedural requirements does not necessarily constitute a denial of [federal] due process; the alleged violation must result in a procedure which itself falls short of standards derived from the Due Process Clause." (citation omitted)).

Second, not every purported procedural defect forecloses jurisdiction under New Mexico law. In *Lopez*, 754 P.2d at 524, the particular defect was the failure to comply with a state law requiring the Board to render its decision within 90 days of its hearing. That type of deficiency is not at issue in this case. Furthermore, the Board in *Lopez* delayed nearly one and one-half years in rendering a decision—circumstances suggesting a more severe violation of state process than what Guttman alleges. *Id.* Guttman fails to identify any New Mexico case law finding procedural defects of the kind alleged here to be jurisdictional.

More importantly, when examined solely from the perspective of federal law, the alleged deficiencies do not rise to level of a denial of process. Guttman's only potentially meritorious claim is that, as an adjudicatory officer, Parsons was

-23-

biased through his personal knowledge of Guttman. But we have held that "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal . . . ." *Corstvet v. Boger*, 757 F.2d 223, 229 (10th Cir. 1985). Furthermore, a person claiming bias "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

Guttman has not met this burden. Parsons's prior knowledge of Guttman's disability—gained through Guttman's quarterly visits before the Board between 1993 and 1995, when he practiced under a stipulated license—does not violate federal due process. "Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not . . . disqualify a decisionmaker" or demonstrate actual bias. *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976). Guttman does not allege any other facts that make a substantial showing of personal bias.

In summary, the alleged violations of New Mexico law, standing alone, do not indicate a denial of procedural due process.

### c. Equal Protection Claims

Finally, Guttman alleges the Board violated his equal protection rights by treating him differently because of his disability. He claims the Board handled the complaints against him differently than similarly situated physicians who came before the Board for disciplinary purposes.

The district court dismissed Guttman's equal protection claim after concluding "a legitimate public safety concern—the protection of patients from a mentally unstable physician—is an abundantly rational basis for treating Plaintiff differently from other similarly situated physicians." R. at 352–53. Although Guttman references his equal protection rights at several points in his brief, he fails to substantively challenge the district court's holding that the Board did not violate the Equal Protection Clause. Accordingly, Guttman "waived this issue through [his] failure to adequately address it in [his] opening brief." *See Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1292 n.1 (10th Cir. 2008).

In any event, we agree with the district court that the state had a rational basis for treating Guttman differently from other physicians. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* Although certain classifications—such as race or national origin—are "subject to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest," *see id.*, the "States are not

required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards such individuals are rational." *Garrett*, 531 U.S. at 367.

*       *       *

Because we find the Board did not commit an actual violation of the Fourteenth Amendment, Guttman's claims against New Mexico must rest solely on alleged Title II violations. In his ADA claims, Guttman contends New Mexico revoked his medical license on the basis of his mental disability without complying with Title II's prophylactic protections. Thus, we must proceed to the final *Georgia* step to determine whether the purported abrogation of sovereign immunity is valid.

### 3. Step Three: Sovereign Immunity Analysis

Under the Fourteenth Amendment, a state may be subject to a statutory suit under Title II of the ADA, even if there is no allegation of an actual Fourteenth Amendment violation. *See Lane*, 541 U.S. at 523. This is because, as the Supreme Court has explained, the scope of Congress's power to enact remedial legislation under § 5 of the Fourteenth Amendment is broad. "Congress' power 'to enforce' the [Fourteenth] Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct" than that which the Amendment itself proscribes. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81 (2000). More importantly,

"[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States." *City of Boerne*, 521 U.S. at 518 (quotation omitted).

In line with these principles, the Supreme Court has held Congress may abrogate state sovereign immunity if Congress (1) unequivocally indicates its intent to abrogate state sovereign immunity, and (2) acts pursuant to a valid grant of constitutional authority under § 5. *Garrett*, 531 U.S. at 363. Here, there is no question Congress intended Title II to abrogate state sovereign immunity. The ADA specifically provides: "A state shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202.

Thus, the remaining question is whether Congress's intent to abrogate state sovereign immunity is a valid exercise of its enforcement power under § 5. To arrive at an answer, *City of Boerne* requires us to consider (1) the nature of the constitutional right at issue; (2) the extent to which Congress's remedial statute was passed in response to a documented history of relevant constitutional violations; and (3) whether the congressional statute is "congruent and proportional" to the specific class of violations at issue, given the nature of the

-27-

relevant constitutional right and the identified history of violations.  521 U.S. at

529–36*; see also Lane*, 541 U.S. at 522, 529–30.

Before proceeding, we emphasize that this is an as-applied challenge.  The

Supreme Court has instructed us to assess Eleventh Amendment abrogation on a

case-by-case basis—"[w]ith respect to the particular [governmental] services at

issue in [the] case." *Id.* at 527 (considering the specific history of discrimination

in the area of access to the courts); *see also Garrett*, 531 U.S. at 365 (the "as

applied" test requires "identify[ing] with some precision the scope of the

constitutional right at issue").  This case-by-case approach is especially important

in the Title II context, because Title II "reaches a wide array of official conduct in

an effort to enforce an equally wide array of constitutional guarantees." *Lane*,

541 U.S. at 530.  Accordingly, in *Lane*, *see id.* at 527, the Court did not consider

Title II, "with its wide variety of applications, as an undifferentiated whole";

rather, it considered the Title II remedy as it applied specifically to discrimination

involving the fundamental right of access to the courts.  The Court underscored

the as-applied focus in *Georgia*, 546 U.S. at 159, where it directed lower courts to

consider each state sovereign immunity case on a "claim-by-claim basis."

Given this framework, we approach each of the three prongs of the

abrogation inquiry with respect to the specific right and class of violations at

issue.  Although some appellate courts read *Lane* to conclusively establish that

Title II, taken generally, survives the first two prongs of the inquiry (which

-28-

address the scope of the right and the historical record) in all cases, *see, e.g.*, *Klingler v. Director, Dep't of Revenue, State of Mo.*, 455 F.3d 888, 896 (8th Cir. 2006); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005); *Ass'n for Disabled Ams., Inc. v. Florida Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005); *McCarthy ex rel. Travis. v. Hawkins*, 381 F.3d 407, 423 (5th Cir. 2004), we agree with the First Circuit that the correct approach, as dictated by the Court's approach in *Lane*, is to analyze all three prongs with regard to the particular right and class of state action at issue, *Toledo v. Sanchez*, 454 F.3d 24, 35 (1st Cir. 2006).

This approach is consistent with *Lane*, 541 U.S. at 527, where the Court, for each of the three prongs of the *City of Boerne* inquiry, expressly grounded its analysis in the specific right of access to the courts. For example, in analyzing the first prong, the Court highlighted its precedents establishing the right of access to the courts as a fundamental right. *Id.* at 522–23. And in analyzing the second prong, the Court reviewed Congress's findings of unconstitutional discrimination "[w]ith respect to the particular services at issue in [the] case." *Id.* at 527. Because we must undertake the same analysis, we find that *Lane* does not conclusively settle the first two prongs of the *City of Boerne* test for all classes of services. Indeed, there is no doubt the particular services at issue here are categorically different from the particular services at issue in *Lane*. With this in mind, we apply the three-part analysis.

### a. Scope of the Constitutional Right

Under the first element of the *City of Boerne* analysis, we determine the nature of the constitutional right at issue and the related class of state action. In *Lane*, 541 U.S. at 522–23, the Supreme Court concluded Congress enacted Title II to "enforce the Fourteenth Amendment's prohibition on irrational disability discrimination," and also to "enforce a variety of other basic constitutional guarantees, . . . infringements of which are subject to more searching judicial review." The Court specifically identified the right at issue as the fundamental right of access to the courts. *Id.* This right can be infringed only if state action survives heightened judicial scrutiny.

Here, the right at issue is a disabled individual's right to practice in his chosen profession; this right, unlike the one at issue in *Lane*, does not invoke heightened scrutiny. Indeed, although "the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment," this right is "subject to reasonable government regulation." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999); *see also Collins v. Texas*, 223 U.S. 288 (1912) (the right to practice medicine is not a fundamental right). The same is true with disability discrimination: a state's decision to treat the disabled differently than others "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Garrett*, 531 U.S. at

366–67 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)); *City of Cleburne*, 473 U.S. at 442 (persons with disabilities are not a suspect class).

### b. Historical Record of Constitutional Violations

We next consider the extent to which Title II was "responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532. With respect to Title II generally, *Lane* settles the issue. In *Lane*, 541 U.S. at 524, the Court found that Congress "enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs," and that it specifically considered evidence of discrimination in areas such as education, access to the courts, transportation, communications, health care, and other public services. The Court noted the "sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services," and concluded that it is "clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Id.* at 528, 529. In light of this holding, we recognize that Title II may validly abrogate state sovereign immunity in some instances.

Because this is an as-applied challenge, however, we also must follow the Court's lead in *Lane* and consider the congressional record speaking to the history of unconstitutional discrimination against the disabled with regard to their right to practice in their chosen profession. 541 U.S. at 527 (considering Congress's

-31-

historical findings "[w]ith respect to the particular services at issue in [the] case").  The problem for Guttman is that Congress did not identify a history of irrational discrimination in professional licensing when enacting Title II.  *See, e.g.*, 42 U.S.C. § 12101; S. Rep. No. 101-116 (1989); H.R. Rep. No. 101-485 pts. 1, 2, 3 & 4 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267; H.R. Conf. Rep. 101-558 (1990); H.R. Conf. Rep. No. 101-596 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565; *see also Roe v. Johnson*, 334 F. Supp. 2d 415, 422 (S.D.N.Y. 2004).

Based on our survey of the record, Congress has never specified a longstanding pattern of disability discrimination in professional licensing, much less any irrational discrimination that rose to the level of a constitutional violation.  *Cf. Garrett*, 531 U.S. at 370 (with respect to Title I of the ADA, finding there were insufficient congressional findings to demonstrate a pattern of state discrimination in the employment of persons with disabilities).  Guttman and the United States do point to isolated examples of discrimination in licensing teachers, *see, e.g.*, H.R. Rep. No. 485, Pt. 1, 101st Cong., 2d Sess. 29 (1990); 2 Staff of the House Comm. on Educ. & Labor, 101st Cong., 2d Sess., *Legislative History of Pub. L. No. 101-336: The Americans with Disabilities Act* 1040, 1611 n.9 (Comm. Print 1990), but Appellants do not identify anywhere that Congress addressed unconstitutional professional licensing directly, or at any length.

For these reasons, Guttman's case is categorically different than *Lane*. Whereas in *Lane*, Congress documented a lengthy history of discrimination in the

access to judicial services and facilities, here there is no such specific history. The historical testimony supporting abrogation is far removed from the discrimination in the administration of public programs and services—namely, the repeated infringement of fundamental rights and denial of access to public facilities—that *Lane* found in Title II's congressional record.

Therefore, we find the history of unconstitutional discrimination against the disabled regarding their right to practice in their chosen profession, as reflected in the congressional record, is minimal. This alone suggests Title II likely does not validly abrogate sovereign immunity in the area of professional licensing. *See Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627, 646 (1999) (explaining that although "lack of support in the legislative record is not determinative," the "expansive" remedial measure at issue did not validly abrogate state sovereign immunity because the record "at best offer[ed] scant support for Congress' conclusion that [states were violating the constitution].").

### c. Congruence and Proportionality

In any event, even "were it possible to squeeze out of [Appellants'] examples a pattern of unconstitutional discrimination by the States, the rights and remedies created by [Title II] against the States would raise . . . congruence and proportionality [concerns]." *Garrett*, 531 U.S. at 372. In this third prong, the question is whether Title II is congruent and proportional to the specific class of

violations at issue, given the nature of the relevant constitutional right and the identified history of violations.

The congruence and proportionality inquiry is a targeted one. We have already identified the scope of the constitutional right at issue: the right of the disabled to practice in their chosen profession. We also must identify the relevant class of state action at issue in this case. The parties disagree on this point. New Mexico contends, and the district court agreed, that Congress's enforcement power should be considered only in relation to Congress's authority to remedy discrimination in the area of "*professional* licensing." In contrast, Guttman and the United States contend we should address Title II as it applies to the expansive category of "*public* licensing," which implicates a broader array of state action, including the issuance of fishing and driving licenses.

We agree with New Mexico that, because the right at issue is the right to practice in a chosen profession, "professional licensing" is the correct category of state action in this case. This narrower focus comports with the approach in *Lane*, 541 U.S. at 522. The plaintiffs in *Lane* could not enter a courthouse because the state did not accommodate their physical disabilities. *Id.* In determining whether Title II validly abrogated sovereign immunity, the *Lane* Court did not consider all disability discrimination or even all state-owned buildings; instead, it zeroed in on buildings that contain judicial functions. *See id.* at 530–31 ("[T]he question presented in this case is not whether Congress can

-34-

validly subject the States . . . [to] money damages for failing to provide reasonable access to hockey rinks, or even to voting booths, but whether Congress had the power under § 5 to enforce the constitutional right of access to the courts."). Thus, *Lane* identified a narrow category of state action that focused the analysis on a specific individual right—the right of access to the courts.

The logic behind *Lane* suggests we focus on professional licensing as the proper category of state action. By tethering our analysis to state professional licensing decisions and an individual's right to practice in a given profession, we may focus our analysis on a limited set of governmental rights, interests, and historical violations. If we were to instead focus on the general category of *public* licensing, we would need to address a heterogeneous set of state action—everything from regulating the fundamental right of marriage to the decidedly non-fundamental rights to fish or cut hair—so as to distract the inquiry from Congress's § 5 enforcement authority, which is proportional to the importance of the right asserted.[3] Recognizing this, the district court correctly

---

[3] The United States contends the range of governmental conduct implicit in public licensing is narrower than the range considered in *Lane*, but it does not explain how. In support of adopting this category, the government cites *Toledo,* 454 F.3d at 24, in which the First Circuit focused its analysis on "government conduct at all levels of public education," as opposed to only higher education. But even this category is far narrower than public licensing; university and high school teachers share much more in common than licensed brides and licensed doctors. Furthermore, as noted below, the category chosen in *Toledo* is supported by a well-identified history of disability discrimination that is common to all levels of public education. *See id.* at 36–39.

concluded: "Lumping these licensing categories together eliminates the case-specific balancing that is necessary to resolve the question before the Court."  R. at 365–66.

Thus, we ask only whether Title II is congruent and proportional in the context of the class of cases implicating disability discrimination in professional licensing.  *See Lane*, 541 U.S. at 530.

Our survey of Supreme Court cases fails to reveal precisely what it means for legislation to be congruent and proportional.  In its first set of cases assessing congruence and proportionality, the Supreme Court struck down four separate pieces of § 5 enforcement legislation.  First, in *City of Boerne v. Flores*, 521 U.S. at 535–36, the Court deemed the Religious Freedom Restoration Act (RFRA) unconstitutional.  The Court held that RFRA—which prohibits the Government from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability—was not a proper means to remedy the substantive constitutional violations it aimed to correct.  *Id.* at 519; 42 U.S.C. § 2000bb-1.  The Court held, "Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause.  Congress does not enforce a constitutional right by changing what the right is." *Boerne*, 521 U.S. at 508.  In short, Congress impermissibly altered a substantive constitutional right, whereas  § 5 grants Congress only the limited power to craft *remedies* for existing guarantees.

Then, in *Florida Prepaid*, 527 U.S. at 647, the Court found that the Patent and Plant Variety Protection Remedy Clarification Act did not validly abrogate state sovereign immunity. In support of its holding, the Court pointed to the insufficient historical record of constitutional violations in the realm of state patent infringement and the overly broad sweep of the challenged legislation. *Id.* Similarly, in *Kimel v. Florida Board of Regents*, 528 U.S. 62, 81 (2000), the Court held that the Age Discrimination in Employment Act, as applied to states, exceeded Congress's authority under § 5. The Court reasoned Congress had exceeded its enforcement power by failing to identify "any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation." *Id.* at 89. And in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. at 374, the Court found the provision of Title I of the ADA that permitted individuals to sue states for money damages exceeded Congress's § 5 remedial authority. The Court was persuaded by the striking contrast between the sparse legislative record supporting Title I and Congress's substantial historical findings with regard to the Voting Rights Act. *Id.* at 369. The Court found the "half-dozen examples" of state-sponsored disability discrimination fell "far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based." *Id.* at 369, 370.

Then, in two more-recent cases, the Court found Congress validly

-37-

abrogated state sovereign immunity. First, in *Nevada Department of Human Resources v. Hibbs*, 538 U.S. at 724, the Court upheld the constitutionality of the family-care provision of the Family and Medical Leave Act (FMLA) as applied to the states. The Court did so, in large part, because, with the FMLA—unlike with the statutes at issue in *Florida Prepaid*, *Kimel*, and *Garrett*—Congress sought to prevent discrimination against a protected class of citizens. *Id.* at 730.

The Court applied the same logic in *Tennessee v. Lane*, 541 U.S. at 533–34, where it upheld Title II of the ADA as applied to claims by the disabled alleging they had been denied access to the courts on account of their disability. In *Lane*, the Court addressed the right of access to the courts—a fundamental right that may not be encroached upon unless the infringing provision survives strict scrutiny. The Court noted that the "unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination." *Id.* at 531. Because both *Hibbs* and *Lane* involved rights implicating heightened scrutiny, "it was easier for Congress to show a pattern of state constitutional violations than in *Garrett* or *Kimel*, both of which concerned legislation that targeted classifications subject to rational-basis review." *Id.* at 529.

Unfortunately, these cases shed limited light on what it means for a statutory remedy to be congruent and proportional to a class of constitutional violations. Nowhere has the Court set forth an easily administrable test for

determining proportionality or identified the factors that a court should consider in assessing congruence. Nevertheless, there is a lesson we can glean from the Court's precedents. Whether a remedial provision is an appropriate response (i.e., congruent and proportional) to a purported class of constitutional violations depends on how well-tailored the congressional remedy is to the nature of the right and the history of violations.

In undertaking this analysis, it is plain we must give Congress a wider berth where, as in *Hibbs* and *Lane*, the right it seeks to vindicate through a statutory remedy is subject to heightened scrutiny. When fundamental rights (like access to the courts) or suspect classes (such as racial or ethnic minorities) are implicated, Congress's historical findings need not be as exhaustive, and the congruence and proportionality of the remedial measure need not be as precise. Conversely, when the relevant rights are less constitutionally significant, Congress has substantially less authority. As the Supreme Court has instructed, "[w]hile § 5 authorizes Congress to enact reasonably prophylactic remedial legislation, the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent." *Lane*, 541 U.S. at 523. "Difficult and intractable problems," the Court explained, "often require powerful remedies," but "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Id.* at 524 (quotations omitted). Therefore, to remedy infringement of non-fundamental rights, Congress must craft a comprehensive legislative

record and draft focused statutes. These principles are reflected in *Garrett* and *Kimel*, where the Supreme Court struck down federal provisions where the alleged state violations—which involved the rights to be free from disability and age discrimination in employment—were subject only to rational basis review.

In line with these principles, there is a trend of courts holding that, absent the need to vindicate a fundamental right or protect a suspect class, Congress may not abrogate state sovereign immunity. *Buchanan v. Maine*, 377 F. Supp. 2d 276, 283 (D. Me. 2005) ("Absent a fundamental right, based on the law as it has been developed to date, Title II is not a proportional or congruent response to the recognized history of disability discrimination for mental health services.")*; see also Phiffer v. Columbia River Corr. Inst.*, 384 F.3d 791, 793 (9th Cir. 2004) (O'Scannlain, J., concurring) ("It is therefore open to question whether Title II validly abrogates state sovereign immunity where no . . . fundamental right is at issue."); *see also Press v. State Univ. of N.Y. at Stony Brook*, 388 F. Supp. 2d 127, 135 (E.D.N.Y. 2005); *Roe*, 334 F. Supp. 2d at 421 n.9 ("Given the Supreme Court's decision in *Lane*, it would appear that there is no longer any basis to find the existence of a cause of action under Title II where no other fundamental right is implicated and the sole justification is the defendant's level of scienter." (citation omitted)); *Johnson v. S. Conn. State Univ.*, No. 02-Civ-2065, 2004 WL 2377225, at *4 (D. Conn. Sept. 30, 2004) ("[I]n the wake of *Lane*, it appears that a private suit for money damages under Title II of the ADA may be maintained

-40-

against a state only if the plaintiff can establish that the Title II violation involved a fundamental right.").  The bent of these cases has led at least one commentator to conclude that, when "the plaintiff is not alleging a constitutional violation and the case does not involve a type of discrimination or a right receiving heightened scrutiny, the state can be sued only if Congress found pervasive unconstitutional state conduct."  Erwin Chemerinsky, *Federal Jurisdiction* 477 (5th ed.).[4]

In addition to these general principles, the Supreme Court has suggested the congruence and proportionality of a remedial statute depends, to some degree, on how costly it is for a state to comply with the statute.  For example, in *Garrett*, 531 U.S. at 372, the Court concluded, under the rational basis test, that "it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities."  Similarly, in *City of Boerne*, the Court found that "[t]he substantial

---

[4]  We pause to note one exception to this trend: discrimination against students in public education.  Several circuit courts have found Title II validly abrogates state sovereign immunity in this context, even though education does not involve a fundamental right.  *See, e.g.*, *Toledo*, 454 F.3d at 39–40; *Constantine*, 411 F.3d at 490; *Assoc. for Disabled Ams., Inc.*, 405 F.3d at 959.  In reaching this conclusion, these courts have been persuaded by (1) the persistent pattern of exclusion and irrational treatment of disabled students in public education, (2) the gravity of the harm worked by such discrimination, and (3) the limited nature of the compliance costs imposed on states.  *See Toledo*, 454 at 39–40.  While the Supreme Court has yet to test the logic of these cases, the cases suggest the exceptionally well-documented history of irrational discrimination in schools is sufficient to compensate for the right's limited value in the constitutional scheme.  *See id.* at 36–39.  Discrimination against students in public education is an exception that proves the rule.

costs RFRA exacts, both in practical terms of imposing a heavy litigation burden on the states and in terms of curtailing their traditional regulatory power, far exceed any pattern or practice of unconstitutional conduct under the Free Exercise Clause."  And in *Lane*, 541 U.S. at 533, the Court was cognizant of the state's cost considerations but nevertheless held, given the fundamental right at issue, "ordinary considerations of cost and convenience alone cannot justify a State's failure to provide individuals with a meaningful right of access to the courts."  Costs are especially relevant when the state's actions are subject only to rational basis review, given that conserving scarce resources may be a rational basis for state action.  When no heightened scrutiny is implicated, a statute that forbids a state from implementing reasonable, cost-effective processes is unlikely to be congruent and proportional.

Here, the area of professional licensing does not implicate a traditional category of fundamental rights.  As the district court correctly noted, professional licensing decisions are subject only to rational basis review, and persons with disabilities do not compose a suspect class.  Accordingly, the Constitution affords New Mexico significant discretion in the realm of professional licensing.  The state's licensing practices and regulations—which, in this case, were designed to prevent harm to patients of medical professionals—need only be rationally related

to a legitimate interest of the State.  Thus, the nature of the right leans against abrogation.

The lack of a historical record demonstrating discrimination in the area of professional licensing leans against abrogation as well.  In *City of Boerne*, the Supreme Court explained that § 5 legislation "must be judged with reference to the historical experience . . . it reflects."  521 U.S. at 525 (quotation omitted); *see also Florida Prepaid*, 527 U.S. at 640 (using the same language); *Lane*, 541 U.S. at 531 (considering Congress's historical findings in connection with the congruence-and-proportionality prong of the *City of Boerne* test).  At best, the Appellants' isolated examples of discrimination in this area are no more substantial than the "half-dozen examples" of state-sponsored disability discrimination identified in *Garrett*, 531 U.S. at 369, which the Court held fell "far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based," *id.* at 370.  Simply put, nothing in the congressional record suggests Title II was a response to pervasive discrimination in the area of professional licensing.

Moreover, we find the Title II remedy, as applied to professional licensing, "far exceeds what is constitutionally required in that it makes unlawful a range of alternate responses [to discrimination] that would be reasonable . . . ."  *Garrett*, 531 U.S. at 372.  Although Title II permits some flexibility by requiring only reasonable efforts at accommodation, the statute's sweep is exceptionally broad.

-43-

The abrogation of sovereign immunity here would require states to justify a significant range of rational, everyday licensing decisions that would otherwise be constitutional. For example, despite the fact that Title II does not require a state to license a professional who poses "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services," 42 U.S.C. § 12182(b)(3), it nevertheless places a substantial burden on the state to demonstrate the risk posed by a professional whose disability cannot be eliminated or mitigated.

Finally, we emphasize the state's strong interest in crafting reasonable, cost-effective medical licensing procedures. In contrast to many other public services, states have strong, historical interests in medical licensing, which touches on the core governmental function of promoting and protecting the general public welfare. *See Dent v. West Virginia*, 129 U.S. 114, 122 (1889); *see also Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1164 (10th Cir. 1999) ("[T]here is no question that the licensing and discipline of physicians involves important state interests."); *Brinkley v. Hassig*, 83 F.2d 351, 354 (10th Cir. 1936) ("The power of the state to protect its citizens against imposition by those purporting to practice the learned professions has been sustained without dissent for many generations.").

Ultimately, we are presented with a right that is not fundamental, very little evidence of a widespread pattern of irrational state discrimination in professional licensing, and a wide-reaching statute that inhibits a state's ability to safely and efficiently make professional licensing decisions. Title II prohibits a significant range of state action in this realm that would easily survive rational basis review. Accordingly, in this instance, Title II is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532.

We conclude Title II does not validly abrogate New Mexico's sovereign immunity in the context of professional licensing. Therefore, the district court properly dismissed Guttman's Title II claims against New Mexico.

### III.  Claims Against the Individual Defendants

We now turn to Guttman's claims against Khalsa and Parsons. No doubt due to this case's tangled procedural history, the parties disagree whether any claims remain. Guttman first contends the district court erred in dismissing his stigma-plus claim on the basis of qualified immunity. But as we explain, at the time New Mexico revoked Guttman's medical license, it was not clearly established that an employment-related stigma-plus claim could be brought outside the context of a termination decision.

Guttman also asserts that, because prior decisions have addressed only his claims for money damages, he still has live claims for prospective injunctive

-45-

relief. While the district court believed this claim had been resolved at an earlier stage in the litigation, we cannot conclude from our review of the record that the claim was in fact disposed of below. Consequently, we remand to the district court for further consideration of this claim.

### A. Stigma-Plus Claim

Guttman alleges Khalsa and Parsons knowingly published false and stigmatizing information about him in the National Practitioner Data Bank, foreclosing his ability to practice medicine. After finding the individual defendants are protected by qualified immunity, the district court dismissed this claim. We agree.

"[G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant asserts qualified immunity, the burden shifts to the plaintiff, who must demonstrate on the facts alleged that (1) the defendant violated his constitutional or statutory rights, and (2) the right was clearly established at the time of the allegedly unlawful activity. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

There are two elements of a stigma-plus claim: (1) governmental defamation and (2) an alteration in legal status. *Brown v. Montoya*, 662 F.3d

-46-

1152, 1167 (10th Cir.) (citing *Paul v. Davis*, 424 U.S. 693 (1976)). When these two elements are present, the government may have "violate[d] a liberty interest that triggers a procedural due process protection." *Id.* The stigma-plus authorities emphasize that "defamation, standing alone, [is] not sufficient to establish a claim for deprivation of a liberty interest." *Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723, 726 (10th Cir. 2000). There must be a change of legal status as well.

Therefore, in the employment context, "the defamation had to occur in the course of the *termination of employment*." *Paul*, 424 U.S. at 710 (emphasis added). An employee has a "liberty interest in his good name and reputation as it affects his protected property interest in continued employment." *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994). But this liberty interest is only infringed by defamatory statements if a four-factor test is satisfied: (1) the statements must impugn the employee's good name, reputation, honor, or integrity; (2) the statements must be false; (3) the statements must occur in the course of terminating the employee or must foreclose other employment opportunities; and (4) the statements must be published. *Workman*, 32 F.3d at 481; *see also Darr v. Town of Telluride*, 495 F.3d 1243, 1255 (10th Cir. 2007).

Guttman contends New Mexico's allegedly defamatory report injured his professional reputation, foreclosing employment opportunities in the field of medicine. This claim fails, however, because at the time the allegedly defamatory

-47-

report was published, we had interpreted the stigma-plus doctrine, as applied in the area of employment, to be limited to claims of defamation occurring in the course of employment *termination*:

> At first blush, it appears that [the third factor] can be met either by statements made in the course of terminating an employee or, in the alternative, by any other statements that might foreclose other employment opportunities. *Workman*, [32 F.3d at 475,] which was decided on other grounds, did not examine this question. . . . While the language of *Workman* may be susceptible to another reading, we conclude that the *Workman* court did not intend to create a test under which a liberty interest might be infringed by any defamatory statement that might foreclose future employment opportunities.

*Renaud*, 203 F.3d at 728 n.1 (relying on *Paul*, 424 U.S. at 710). Shortly after *Renaud* was decided, the Supreme Court confirmed our interpretation in *Siegert v. Gilley*, 500 U.S. 226, 234 (1991), finding the former employee of a government hospital could not bring a stigma-plus claim against an ex-supervisor. The Court held that, because "[t]he alleged defamation was not uttered incident to the termination of [his] employment by the hospital," the plaintiff had failed to state a claim for the denial of a constitutional right. *Id.*

These cases preclude Guttman's claim here. Since the individual defendants in this case did not employ Guttman in the first place, much less defame him in the context of terminating his employment, their conduct did not violate a clearly established right.

-48-

In short, the district court did not err in dismissing the stigma-plus claim against Khalsa and Parsons.

## B. Guttman's Claim for Injunctive Relief

One final claim remains to be resolved: Guttman's demand for injunctive relief under *Ex parte Young*. To determine whether Guttman can proceed on his *Ex parte Young* claim requires us to review again both the nature of the asserted claim and the procedural history of this case.

### 1. *Ex parte Young* Doctrine

"In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity for suits against state officials seeking to enjoin alleged ongoing violations of federal law." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011). By proceeding on the fiction that an action against a state official seeking only prospective injunctive relief is not an action against the state itself, the *Ex parte Young* doctrine enables "federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984)). To determine whether the *Ex Parte Young* doctrine applies, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub.*

*Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quotation marks omitted) (alteration in the original).

An individual can bring an *Ex parte Young* claim against a state official in federal court for an ADA or § 1983 violation. *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1233 (10th Cir. 2001). In *Garrett*, 531 U.S. at 374 n.9, the Supreme Court reaffirmed that an *Ex parte Young* ADA claim can proceed even if the state defendants are protected by sovereign immunity. Although *Garrett* involved a suit brought under Title I of the ADA, there is no relevant difference between Title I and Title II as far as the availability of prospective injunctive relief is concerned. *See Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 913 (7th Cir. 2003).

In summary, neither a state official's absolute immunity nor a state's sovereign immunity bars a plaintiff from bringing an *Ex parte Young* claim for a violation of Title II of the ADA.

### 2. Guttman's *Ex parte Young* Claim

Guttman initiated this action in 2003 by filing a pro se civil complaint against New Mexico, Khalsa, and Parsons. The complaint contained two counts: an ADA violation and a violation of procedural due process. The complaint did not expressly request prospective relief or refer to the individual defendants in their official capacities.

Shortly thereafter, the defendants filed a motion for dismissal or summary judgment. Responding to this motion, Guttman stated he was "asking this Court, under § 1983 and the ADA, to enjoin these Defendants in their individual and official capacities from their prospective and ongoing violations of the ADA and Dr. Guttman's procedural due process rights." Pl.'s Resp. to Defs.' Mot. to Dismiss or for Summ. J. at 16, *Guttman I*, 320 F. Supp. 2d 1164 (D.N.M. June 16, 2003) (No. Civ. 03-463 LCS) (Doc. No. 9).[5]

When the defendants replied that the pro se complaint did not contain an *Ex parte Young* claim, Guttman filed a surreply that argued "the contrary is true," because "seeking relief under the ADA includes prospective injunctive relief." Pl.'s Surreply to Defs.' Reply to Defs.' Mot. to Dismiss or For Sum. J. at 2, *Guttman I*, 320 F. Supp. 2d 1164 (D.N.M. Aug. 8, 2003) (No. Civ. 03-463 LCS) (Doc. No. 16). Guttman also noted that the district court must liberally construe his complaint because it was filed pro se. *Id.* (citing *Brown v. Zavaras*, 63 F.3d 967, 972 (10th Cir. 1995)). As a result, Guttman argued, "[t]he factual allegations stated by the Plaintiff in his Complaint are sufficient to raise a claim under the ADA, seeking prospective injunctive relief under *Ex parte Young*." *Id.*

---

[5] We recognize some documents filed in the district court are not part of the record on appeal. Nevertheless, we have authority to review them because we may take judicial notice of public records, including district court filings. *See United States v. Smalls*, 605 F.3d 765, 768 n. 2 (10th Cir. 2010) (taking judicial notice of district court record that was not part of the record on appeal).

Although the district court granted defendants' motion, *Guttman I*, 320 F. Supp. 2d at 1164, the court also appeared to agree with Guttman's construction of his complaint, noting that "Plaintiff seeks prospective injunctive relief and damages under the ADA." *Id.* at 1168–69. Nonetheless, the district court granted summary judgment to defendants on all Title II and § 1983 claims, based on two alternative grounds: (1) the court lacked jurisdiction under *Rooker-Feldman* doctrine, and (2) the defendants were protected by absolute immunity. *Id.* at 1171.

Guttman timely appealed. In addition to contesting the district court's *Rooker-Feldman* and immunity decisions, he argued that a claim for prospective injunctive relief remained against individual state officials, as permitted by *Ex parte Young*. We affirmed the district court's application of *Rooker-Feldman*, but the Supreme Court reversed and remanded our opinion in light of *Exxon Mobil*, 544 U.S. at 280. *Guttman II*, 401 F.3d at 1170, *vacated and remanded,* 546 U.S. 801 (2005).

With the case back before us on remand, we asked the parties to file supplemental briefing. In his brief, Guttman argued, among other things, (1) his complaint contained a claim for prospective injunctive relief, (2) Eleventh Amendment immunity does not prohibit *Ex parte Young* claims, and (3) *Garrett* recognized the *Ex parte Young* exception to sovereign immunity in the ADA context. Aplt.'s Supplemental Br. Following Remand from the U.S. Supreme Ct.

-52-

at 16, *Guttman III*, 446 F.3d 1027 (10th Cir. Dec. 20, 2005) (No. 03-2244).  The

brief's conclusion reiterated that the defendants "possess no immunity against

[Guttman's] claims for injunctive relief in their official capacity . . . ."  *Id.* at 25.

Nonetheless, we decided *Guttman III* without mentioning or addressing

Guttman's claim for prospective relief.  Instead, our decision contained the

following conclusion and mandate:

> We AFFIRM the district court's determination that both
> Parsons and Khalsa are protected by absolute immunity.
> However, we REVERSE the district court's determination that
> New Mexico is protected against all suits under Title II of the
> ADA by sovereign immunity and REMAND for hearings
> consistent with this opinion.

*Guttman III*, 446 F.3d at 1036.

Back before the district court, Guttman filed an amended complaint, adding

the following claims: (1) an equal protection claim, (2) a First Amendment

retaliation claim, (3) a stigma-plus claim, and (4) a claim for injunctive relief

against the individual defendants in their official capacities.

Because *Guttman III* did not mention the *Ex parte Young* claim, but

nonetheless remanded the case to the district court "for hearings consistent with

this opinion," the parties disagreed whether we affirmed the dismissal of that

claim.  The defendants filed a motion to dismiss that argued Khalsa and Parsons

were immune from suit without specifically mentioning the claims for prospective

relief.

-53-

In response, Guttman "concede[d] that not only this Court, but the 10th Circuit has determined that Khalsa and Parsons are immune from suit under Dr. Guttman's claims as reviewed." Pl.'s Resp. to Defs.' Mot. to Dismiss at 18, *Guttman v. Khalsa*, No. Civ. 03-463-MCA-KBM (D.N.M. Aug. 14, 2006) (Doc. No. 33). Nonetheless, he argued, "that in no way precludes Dr. Guttman's claims for prospective injunctive relief against the individuals in their official capacity. The *Ex parte Young* exception . . . would apply to Dr. Guttman's claims against the individuals in their official capacity for injunctive relief under the ADA . . . . The Eleventh Amendment does not bar such suits." *Id.* at 18–19.

Granting in part defendants' motion to dismiss, the district court rejected Guttman's *Ex parte Young* argument, holding that because both he and this court had granted immunity to Khalsa and Parsons on the basis of absolute immunity, they are not subject to suit under the ADA or § 1983.

Despite this ruling, Guttman continued to press his *Ex parte Young* claim. At a motion hearing convened in response to his motion to reconsider, Guttman argued that, "[as] established in U.S. Supreme Court precedent, although absolute immunity and qualified immunity offer protection to officials from civil damages, they do not preclude or protect against a claim for prospective injunctive relief and the recovery of attorney's fees for a successful plaintiff." Pl.'s Resp. to Mot. to Stay and Mem. in Supp. at 2, *Guttman v. Khalsa*, No. Civ. 03-463-MCA-KBM (D.N.M. Mar. 14, 2007) (Doc. No. 63).

In June 2010, after separately considering Guttman's ADA claim against New Mexico, the district court turned to his claims against the individual defendants. After reviewing the procedural history, the court made the following finding:

> In September 2003, the [District] Court issued a "final order," which stated that "[s]ummary judgment is hereby entered in favor of Defendants G.T.S. Khalsa, Livingston Parsons and the State of New Mexico on Plaintiff's claims under 42 U.S.C. § 1983 . . ." *Guttman I*, 320 F. Supp. 2d at 1171. The Tenth Circuit's *Guttman III* opinion affirmed the grant of immunity to the Individual Defendants and did not address additional "official capacity" liability for prospective relief—*leaving this Court to presume that the issue of prospective relief against Individual Defendants was not raised before the Circuit.*

R. at 382. [Mem. Op. & Order at 8, *Guttman v. Khalsa*, No. Civ. 03-463-MCA-KBM (D.N.M. June 6, 2010) (Doc. No. 150) (emphasis added).] Based on the silence of the appellate opinions on this issue, the court "conclude[d] that by failing to appeal [the district court's] repeated dismissal of the Individual defendants, Plaintiff has waived any claim for prospective injunctive relief against the Individual Defendants." *Id.* at 9. This statement is belied by the fact that Guttman *did* appeal the district court's dismissal of the individual defendants, both in their individual and official capacities.

In sum, our review of the procedural history leads to several conclusions. First, it remains unclear whether the district court construed Guttman's original pro se complaint to include an *Ex parte Young* claim even though prospective

relief was not expressly requested. Second, despite the confusion, Guttman appears to have advocated a claim for prospective injunctive relief throughout the litigation. If that is the case, then the district court erred in *Guttman I*, 320 F. Supp. 2d at 1171, when it held that the individual defendants' absolute immunity barred the *Ex parte Young* claim. *See Verizon*, 535 U.S. at 645. Finally, although Guttman raised *Ex parte Young* claims on appeal, our opinion in *Guttman III* does not address the claim, and the claims may have remained part of the case on remand.

Given this procedural history, on this record we remain unclear as to the status of Guttman's *Ex parte Young* claim. The claim appears to have been part of the initial district court proceedings, and it was specifically raised in Guttman's first appeal to this court. But the issue does not appear to have been resolved one way or another in the many opinions addressing the claims in this case. With this uncertainty, we conclude the better approach is to remand to the district court to resolve whether the claim has been properly preserved. We express no view on the procedural or substantive merits of the remand.

## CONCLUSION

We **REVERSE** the district court's dismissal of Guttman's *Ex parte Young* claim against the individual defendants on the basis of the alleged ADA violation, **AFFIRM** the dismissal of all other claims against the State of New Mexico and

the individual defendants, and **REMAND** for proceedings consistent with this decision.